Jasen, J.
On this appeal we are asked to consider the admissibility of the results of polygraph tests in a criminal ease.
The defendant is charged with the murder of three persons at a rest area of? Route 81 near the Oity of Watertown on December 31,1964. On January 3, 1965, a statement was taken from defendant regarding his whereabouts on the day of the murder. Thereafter, defendant was questioned several more times. On May 8, 1965, as a result of certain information obtained by the State Police, the defendant became a definite suspect. He was again questioned concerning his whereabouts on the night of December 31,1964, after which the State Police informed him that they did not believe his account of his activities and asked him if he would be willing to submit to a polygraph examination, to which defendant consented. Some months later defendant was taken to the State Police barracks at Malone where he was given the test. Prior to taking the test, defendant *513 was advised of his right and signed a statement acknowledging this.
The polygraph test was administered by Bruce Martinet, a Senior Investigator of the Bureau of Criminal Investigation who had attended a six-week course, three conferences and a refresher course in lie detection. The Stoelting polygraph machine was used for the test to measure the subject’s respiration, blood pressure and heart rate, and his skin’s resistance to electric current.
By a pneumo tube placed around the chest of the subject and over his clothes, the instrument measures the subject’s breathing and records the same by a pen on a chart. The blood pressure and heart rate are recorded separately on the chart by placing an inflated blood pressure cuff around the arm. A galvanometer, or electrodes leading from it, are attached to portions of the subject’s hand and, in this manner, the skin’s resistance to electric current is likewise recorded on the chart. The chart recordings so obtained are claimed to indicate any emotional disturbance or stress during questioning.
The polygraph examination consists of three phases. The first — the pretest phase — consists of the examiner’s familiarizing himself with the problem, such as meeting the subject and obtaining from him pertinent background. The second phase is the test itself, consisting of a series of questions— framed to result in yes/no answers—while the polygraph instrument is attached to the subject. The final phase is the evaluation and interpretation of the chart by the examiner and the formulation of his opinion.
Although the test was taken in July of 1966, a warrant for defendant’s arrest did not issue until March 25, 1968. He was subsequently indicted for murder in the first degree in May, 1968.
In August, 1968, the District Attorney advised defendant’s counsel that the People intended to introduce the polygraph test findings into evidence at the trial. A motion to suppress the results was made and following a hearing the motion was granted by Jefferson County Court. The Appellate Division, Fourth Department, unanimously affirmed without opinion.
For many years instruments to detect deception have been used in industry with increasing frequency, but we have held *514 their reliability has not yet been sufficiently established to give them an evidentiary standing in the administration of the criminal law. (People v. Forte, 279 N. Y. 204; Matter of Sowa v. Looney, 23 N Y 2d 329, 334.)
This refusal to accept the- results of a polygraph instrument test as probative evidence of truth or deception has been followed in most jurisdictions.[1] An exception to this general rule has been made in several States where the parties may stipulate on the record to such admission for any purpose,[2] or for a limited purpose to corroborate other evidence or to impeach or corroborate the defendant’s testimony.[3] However, some of these latter States permit the Trial Judge to exclude the test results if he is not satisfied with the examiner’s competence.
Commentators on the subject are by no means unanimous in their views on the efficacy of the polygraph. The proponents of the machine, many of whom sell polygraphs, or operate either schools for examiners or testing agencies, believe that lying causes measurable physical reactions which the polygraph can record. It is claimed that in the hands of a qualified examiner the' machine is extremely reliable, to the extent of giving positive results in 95% of the cases, uncertain results in 4% of the cases, and error only about 1% of the time. (See Reid and Inbau, Truth and Deception [Williams & Wilkins Co.: Baltimore, 1966], at p. 234; Arthur and Caputo, Interrogation for Investigators, at p. 214; Backster, Don’t Trust the Lie Detector Versus Trust the Lie Detector, Hearings before Subcommittee of Committee on Government Operations, 88th Cong., 2d Sess., Ex. 2 F, at p. 154.)
*515 The opponents of the polygraph are equally .strong in their belief that the lie detector is unreliable. Perhaps the most vehement statement against the polygraph is the conclusion of a subcommittee of the House 'Committee on Government Operations looking into the use of the polygraph in the government: ‘ ‘ There is no ‘ lie detector neither machine nor human. People have been deceived by a myth that a metal box in the hands of an investigator can detect truth or falsehood.
“ * * * [R] esearch completed .so far has failed to prove that polygraph interrogation actually detects lies or determines guilt or innocence.” (Use of Polygraphs as ‘ Lie Detectors’ by the Federal Government, H. Eep. No. 198, 89th Cong. 1st Sess., at p. 1.)
Critics of the polygraph point out that there has been no physiological or psychological proof that lying heightens anxiety, or that anxiety causes the physical reactions which the machine measures. (Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie-Detection, 70 Yale L. J. 694, 702.) As the above-mentioned subcommittee reported: ‘ ‘ When the subject strapped to the machine is asked a question his physiological responses are recorded on the graph by three pens. The experts who appeared before the subcommittee were unanimous that these responses, standing alone, could never be interpreted as verification of truth or indication of lying.” (H. Rep. No. 198, supra, at p. 10.)
The alleged statistical accuracy of the machine has also been challenged. Several critics have contended that the 95% accuracy rate claimed by the proponents of the machine has been arrived at on the basis of improper statistical method. (Skolnick, supra; Sternbach, Gustafson & Colier, Don’t Trust the Lie Detector, Harv. Bus. Eev., Nov.-Dee. 1962, p. 127.) In addition, it is noted that even if statistically proper, the 95% figure is meaningless because undetected guilty individuals are not likely to report that fact to the examiner. (Burkey, The Case Against the Polygraph, 51 A. B. A. J. 855.) Moreover, it has been pointed out that physical or mental abnormalities can render the test invalid (Floch, Limitations of the Lie Detector, 40 J. Crim. L. & C. 651); yet, the statistics provided by the machine’s adherents appear to take no cognizance of this.
*516 Moreover, opponents of the machine also contend that polygraph tests are unreliable because the people administering and interpreting them are inadequately trained. It is pointed out that use of the polygraph touches areas in medicine, psychology, and sociology; yet most examiners have no training in those sciences. (Skolnick, op. cit., supra, 704-707.) In fact, Fred E. Inbau, one of the leading proponents, of the polygraph, has testified before the House 'Committee on Government Operations that 80% of the persons calling themselves polygraph examiners are not qualified to interpret test results. (Hearing before the Subcommittee of the House Committee on Government Operations, 88th Cong., 1st Sess., pt. 1, at p. 8 [1964].) Inbau and his associate, John Reid, admit that as a result of this lack of training, the incompetent examiner, rather than admit his inability to draw any conclusion from the test results, is- likely to render a report which will meet with the favor of the person or agency which retains him. (Reid and Inbau, Truth and Deception, op. cit., supra, at p. 235.)
Turning to the case before us, the People presented the testimony of attorney-F. Lee Bailey to the effect that people who work with polygraphs regard them as reliable, and that he in fact uses the machine in interviewing prospective clients. Dr. William J. Yankee, a psychologist and instructor at the Keeler Polygraph Institute, testified that physical or psychological threats may cause the autonomic nervous system to react and the polygraph measures this reaction. Lynn Marcy, a private polygraph examiner and instructor at the Keeler Polygraph Institute, indicated that qualified examiners will always agree on a test .result; however, he admitted that there are no definite set of standards for polygraph examiners.[4] Cleve Backster, a polygraph instructor, described what the graph *517 taken from the machine indicates, and Officer Martinet described the five-part test procedure.
An analysis of the polygraph test administered here and its results clearly indicate that the prosecution has failed to meet the standard set by this court “ to show a general scientific recognition that the [polygraph] possesses efficacy.” (People v. Forte, supra, at p. 206.)
The examiner here testified that the polygraph machine recorded the defendant’s emotional disturbance or stress during the questioning and he interpreted these lines on the chart as indicating that the defendant was either (1) “ practicing deception ”, or (2) lying in his response, or (3) withholding information or some part of the truth. The presence of “ one of the variations ” of deception or a deceptive pattern was described by the examiner, but he did not claim that his interpretation of an emotional disturbance as “ deceptive ” means that the opposite of the defendant’s answer is a fact. Nor did he claim that a denial of guilt by the defendant, even when emotional disturbance is recorded, is the equivalent of an admission of guilt or that the subject is, in fact, guilty of the crime.
Although perfection in test results is not a prerequisite to the admissibility of evidence obtainable by the use of scientific instruments, the rule has been to grant judicial recognition only after the instrument has been sufficiently established to have gained general acceptance in the particular field to which it belongs. (Wigmore, Evidence [3d ed.], § 990.)
Applying this standard, it is clear that the record before us does not adequately establish the reliability of the tests to be admissible in evidence. As previously indicated, the criterion for interpretation of the test chart has not as yet become sufficiently definite to be generally reliable so as to warrant judicial acceptance; nor can it be said that the examiner’s opinion demonstrates reasonable certainty as to the accuracy of the polygraph test in most instances.
As the Michigan Supreme Court said in People v. Davis (343 Mich. 348), in refusing to consider the results of the test: “ If we were to admit the results of the tests into evidence prematurely and before its general reliability and acceptability have been proven, the value of the test on a particular person *518 could easily become the question in the trial rather than that person’s guilt or credibility.” (Id., at p. 372.)
We are all aware of the tremendous weight which such tests would necessarily have in the minds of a jury. Thus, we should be most careful in admitting into evidence the results of such tests unless their reasonable accuracy and general scientific acceptance are clearly recognized.
Accordingly, the order of the Appellate Division should be affirmed.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Breitel and Gibson concur.
Order affirmed.

. See, e.g., Frye v. United States, 293 F. 1013; Marks v. United States, 260 F. 2d 377; Colbert v. Commonwealth, 306 S. W. 2d 825 [Ky.]; Stone v. Earp, 331 Mich. 606; State v. Cole, 354 Mo. 181; Boeche v. State, 151 Neb. 368; State v. Trimble, 68 N. M. 406; State v. Pusch, 77 N. D. 860; Henderson v. State, 94 Okla. Cr. 45; Peterson v. State, 157 Tex. Cr. Rep. 255; Le Fevre v. State, 242 Wis. 416; State v. Bohner, 210 Wis. 651; State v. Walker, 37 N. J. 208, cert. den. 371 U S. 850; cf 3 Wigmore, Evidence [3d ed.], § 999.

. See Herman v. Eagle Star Ins. Co., 283 F. Supp. 33, affd. 396 F. 2d 427; People v. Houser, 85 Cal. App. 2d 686; State v. Freeland, 255 Iowa 1334; State v. Brown, 177 So. 2d 532 [Dist. Ct. App. Fla.].

. See State v. Valdez, 91 Ariz. 274; People v. Zazzetta, 27 Ill. 2d 302; People v. Potts, 74 Ill. App. 2d 301; see, also, California Ins. Co. v. Allen, 235 F. 2d 178.

. Reid and Inban suggest that before permitting the results of a polygraph examination into evidence, the courts should require that (1) the examiner have a college degree; (2) that he have six months of internship training; (3) that he have at least five years’ experience as a specialist in the field of lie detection; and (4) that the examiner’s testimony be based upon polygraph records that he produces in court and which are available for cross-examination purposes. (Reid and Inbau, Truth and Deception, op. cit., supra, at p. 257.) In this ease the examiner (Officer Martinet) failed to meet the first three qualifications suggested above.