Joseph A. Martinis, J.
Defendant, charged with murder, has, through his counsel, submitted an omnibus motion with several branches, all of which, with the exception of two, have already been determined.
The court reserved decision on the remaining two branches because each of them raised questions of law and considerations of policy that required an extended research and analysis of the issues presented and the arguments made.
The first of these, in the order that they will be considered, requests a bifurcated trial for the defendant; and, the second, the appointment of a cytogeneticist to conduct chromosomal tests of defendant’s blood.
MOTION FOR A BIFURCATED TRIAL
The defendant, Charles Yukl, has been indicted and charged with the murder of 23-year-old Karen Schlegel. The alleged crime is said to have occurred on the night of August 19, 1974, in the defendant’s apartment while the defendant’s wife was temporarily away. The body of the deceased was discovered in a state of disarray shortly thereafter on the roof of defendant’s apartment house.
The defendant had been involved in a similar brutal killing in 1966, for which he was convicted, sentenced and eventually released on parole in 1973 from Wallkill State Prison.
It appears that the defendant intends to interpose an insanity defense. The psychiatric testimony adduced from defense experts will, of necessity, rest heavily on the defendant’s prior violent behavior, in particular, the 1966 brutal killing of Susan Reynolds. In addition, there may be potentially damaging admissions made by the defendant during the course of the psychiatric examination, which the defense would seek to use solely to establish defendant’s mental incapacity at the time of the crime.
*366 The defendant has made a motion for a bifurcated trial on the issues of guilt and insanity. In order to avoid what he claims is the inherent prejudice that would result from the introduction of testimony with respect to the 1966 killing and any admissions made to the psychiatrists, the defendant has requested that the issue of insanity be tried first to a separate jury, and then, should defendant be found sane, another jury will determine if the defendant is guilty of the crime as charged.
The questions that this court must determine are whether bifurcation is a necessary procedure under these circumstances and, secondly, whether it is a proper procedure under the law.
The concept of a bifurcated trial whereby the issues of culpability and mental capacity are tried sequentially is often put forth as a curative procedure to remedy problems similar to those posed by the defendant herein. Thus with ever-increasing frequency defendants similarly situated have been challenging the traditional procedures by which an insanity defense is raised and determined.
No court has yet accepted the argument that the concept of a bifurcated trial is a constitutional right that inures to a defendant in any given case (Murphy v Florida, 495 F2d 553; United States v Huff, 409 F2d 1225, cert den 396 US 857; Simpson v State, 275 A2d 794 [Del]; Commonwealth v Bumpus, 290 NE2d 167 [Mass]). In this jurisdiction, an appeal was urged on the ground that the defendant should have been granted a bifurcated trial. The Court of Appeals in People v Staten (28 NY2d 904) affirmed the conviction without opinion, where the People had contended there was no constitutional right to a bifurcated trial.
However, the concept of a two-staged trial where a defendant raises the defense of insanity has not been totally discarded and, indeed, some of the courts believe that there may be good cause for its adoption in given instances. Three of our States — California, Colorado and Texas — have adopted such a procedure by statute.
However, the procedure, whether prescribed by a court through its inherent powers or by statute, is not feasibly workable. To dichotomize the two issues in separate trials as urged by its proponents cannot be done under the substantive penal law.
The trial of either issue, in whatever sequence, necessitates *367 the determination of some of the elements in the other. So that the concept itself is pregnant with notes of self-contradiction.
Examining this procedural concept which was embodied in the State statute, the highest court of Arizona, the Supreme Court of that State, analyzed and evaluated its feasibility and the history of its application in its own and in other States in State v Shaw Ariz 103).
In its well-reasoned and studied opinion, replete with citations and quotations of other cases and legal commentaries, the court sets forth the labyrinthal paths and the prestidigitation required to overcome the paradoxical conclusions to which the adoption of a bifurcated trial has led and ultimately invalidated the statute as being in violation of constitutional due process.
The basic fallacy in the concept of bifurcation is that the intent to commit the crime with which the defendant is charged is a major element in all serious criminal cases to be alleged and proven by the State. Any diminution of that intent is competent evidence which the defendant must not be precluded from presenting to the trier of the facts. Thus his culpability is predicated not only upon the act that he committed, but also upon his mental state of awareness and/or responsibility at the time he committed the act. Any evidence affecting his capacity to form an intent or bearing upon the mental formulation of intent to commit the act is indeed part of the case. So that it is patently clear that the culpability trial will necessitate the adducing of evidence bearing upon his mental responsibility in cases where an insanity defense is raised. Therefore, elements of his insanity defense will become materially relevant to determine his intent at the time he committed the act.
The adjudication of the insanity issue prior to the determination of the culpability trial would present questions of whether the defendant in fact committed the act with which he is charged. For without such a finding, the resultant adjudication of the defendant’s sanity would be made without a predicate, which is the act that he committed or the corpus of the crime. And, moreover, such an adjudication, if the defendant were found insane at the time he is alleged to have committed such an act, would not be dispositive of the case. It would leave the defendant without any adjudication that he did or did not commit the act, and might very well lead to the *368 raising of constitutional issues of due process because the effect of such adjudication might result in his being institutionalized in accordance with our proceedings. (See CPL 330.20.)
Thus analyzed, such a procedure, if judicially adopted in this jurisdiction as proposed, though sounding, at first blush, as meritorious and expeditious, would not in my opinion be legally feasible under our Penal Law. It is laden with problems of due process and does not accomplish the movant’s purpose of dichotomizing the stated issues in an absolute way. To duplicate the issues in a two-stage proceeding, as is done in the States that have adopted this kind of procedure by statute (California, Colorado and Texas), would only result in exacerbating the legal complexities and furthering delay in the trial of cases.
" 'The bifurcated trial system as it now stands, still appears to be fraught with the same basic legal infirmities which accompanied it at its inception. Such infirmities cannot be cured by the application of procedural remedies’ ” (State v Shaw, 106 Ariz 103, 111, citing 3 Cal West L Rev 159).
Accordingly, the motion for a bifurcated trial is in all respects denied.
MOTION FOR THE APPOINTMENT OF A CYTOGENETICIST
Also, as part of the insanity defense of his client, the attorney seeks the appointment of a qualified cytogeneticist to carry out the chromosomal testing of the defendant’s blood at county expense. Although it is suggested that such testing is not mechanically complex and is inexpensive, the use of the results, if favorable to the insanity defense, would be offered at the trial of the action. Thus the court must determine whether or not evidence of chromosome abnormality should be admitted as a part of the defense of insanity in criminal trials.
Prior to admitting evidence of a scientific nature, the court must determine the threshold question: is the scientific theory, instrument, or test sufficiently established to have gained general acceptance in the particular field to which it belongs? (People v Leone, 25 NY2d 511; III A Wigmore [3d ed], § 990, p 992.)
The existence of the XYY genetic phenomenon was firmly *369 established in 1961.[1] Early studies of chromosome imbalance focused almost exclusively on prison populations. The XYY male, in prison samples, appears to be a very tall, slightly retarded individual with a severely disordered personality characterized by violent, aggressive behavior.[2] However, the sampling, thus far, has been inadequate and inconclusive.[3] A built-in bias exists because samples comprised of institutionalized persons will, of course, contain more than a fair number of violent and aggressive types. The statistical significance to be attached to the results of these studies is in doubt until such time as adequate control group data can be compiled.[4] Scientists and legal commentators appear to be in agreement that further study is required to confirm the initial findings and to concretely establish a causal connection between one’s genetic complement and a predisposition toward violent criminal conduct.[5]
The courts have therefore been noticeably reluctant to admit evidence of genetic abnormality as a factor to negate criminal responsibility. In Maryland, Carl Millard sought to introduce evidence of his XYY condition in his trial for armed robbery. The court excluded the evidence and held that research into the relationship between genetics, criminality, and insanity did not yet "meet reasonable medical certainty standards” necessary for its admission into evidence. The appellate court, affirming the order, did not find that a defense based on XYY was beyond the pale of proof, but that on the basis of the record the trial court acted properly in declining to permit the information to go to the jury (Millard v State, 8 Md App 419).
In People v Tanner (13 Cal App 3d 596, 600), the California intermediate appellate court upheld a lower court ruling *370 barring admission of XYY testimony to support a defense of insanity, stating: "The studies of the '47 XYY individuals’ undertaken to this time are few, they are rudimentary in scope, and their results are at best inconclusive.”
Moreover, the court indicated three specific objections that precluded admission of the testimony of genetic abnormality. First, the experts merely suggested that aggressive behavior may be one manifestation of the XYY syndrome. However, they could not confirm that all XYY individuals are involuntarily aggressive; in fact, some identified XYY individuals have not exhibited such tendencies. Second, the experts could not determine whether or not the defendant’s aggressive behavior even resulted from chromosome imbalance. Third, the experts were unable to state that possession of the XYY anomaly resulted in mental disease which would constitute legal insanity under California law.
The California appellate court considered the problem and found it an entirely proper use of discretion for the lower court to exclude evidence of an XYY condition because the evidence was "not clear and convincing.” (People v Tanner, 13 Cal App 3d 596, 601, supra.) The court analogized to other scientific data — i.e., voice print analysis, lie detector testing— which had likewise been denied admission because they failed to reach the necessary standards of acceptance and reliability in their field.
The objections raised in People v Tanner (supra), appear to be equally valid in this jurisdiction. Section 30.05 of the Penal Law states:
"1. A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or defect, he lacks substantial capacity to know or appreciate either:
"(a) The nature and consequence of such conduct; or
"(b) That such conduct was wrong.”
Thus, in New York an insanity defense based on chromosome abnormality should be possible only if one establishes with a high degree of medical certainty an etiological relationship between the defendant’s mental capacity and the genetic syndrome. Further, the genetic imbalance must have so affected the thought processes as to interfere substantially with the defendant’s cognitive capacity or with his ability to understand or appreciate the basic moral code of his society.
*371 While there is strong evidence which indicates a relationship between genetic composition and deviant behavior, the exact biological mechanism has yet to be determined. Moreover, studies have failed to indicate why only some XYY individuals appear to have a propensity for violence and aggression and not others. The answers to these problems are currently being sought by scientists and their solution will assist immeasureably in providing a firmer footing for the incorporation of chromosome abnormality under the defense of insanity.
However, in New York, Judge Farrell has taken a different approach and permitted, in People v Farley (Sup Ct, Queens County, Indictment No. 1827 [April 30, 1969]), evidence of an XYY condition to go to the jury. The defendant’s insanity defense consisted of the testimony of two witnesses. A reputable psychiatrist rendered his opinion as to the defendant’s mental state at the time of the commission of the crime without regard to the chromosome imbalance of the defendant. The other witness, a medical doctor engaged in genetics research, testified that, based on recent studies in the field, inmates in penal institutions have higher incidence of chromosome imbalance and in the expert’s opinion, the defendant’s chromosome abnormality affected his antisocial behavior. The jury rejected the insanity defense and found the defendant guilty of murder as charged.
Judge Farrell, writing for St. John’s Law Review, indicated that "Its [the XYY syndrome] relevancy as part of an insanity defense should not be opened to serious dispute. At present, the law is geared to continuous expansion of the latitude of proof to be allowed to a defendant in such cases.”[6]
In addition, a court in Australia has accepted the XYY syndrome as part of a valid insanity defense. Laurence E. Hannett was charged with murder and was acquitted after a psychiatrist testified that every cell in his body was abnormal.[7] Likewise in France, Daniel Hugon presented the XYY abnormality as a defense and the court permitted its use in mitigation of sentence.[8]
Notwithstanding the comments of and the practices fol *372 lowed by Judge Farrell in the trial over which he presided and the acceptance by some foreign courts of the XYY syndrome, it appears on the whole that the genetic imbalance theory of crime causation has not been satisfactorily established and accepted in either the scientific or legal communities to warrant its admission in criminal trials.
Accordingly, the motion for the appointment of a cytogeneticist is denied.

. Sandberg, Koepf, Ishehara and Hauschka, An XYY Human Male, 2 Lanat 488.

. Telfer, Are Some Criminals Born That Way?, NYU, Feb. 6, 1969, p 4, col 1.

. Note — The XYY Chromosome Defense, 57 Georgetown U 892; Cockrell, Law Responsibility and The XYY Syndrome, 7 Houston L Rev 355; Alderman, The XYY Syndrome: Its Effect on Criminal Responsibility in New York, 21 Syracuse L Rev 1221; XYY Chromosomal Abnormality; Use and Misuse in the Legal Process, 9 Harv J Legis 469. (March, 1972).

. See n 3.

. While many commentators have suggested that XYY evidence be admitted on the limited data now available, they do agree that further study is necessary to determine how the chromosomal abnormality translates itself into aggressive conduct. (See Burke, The XYY Syndrome: Genetics Behavior and the Law, 46 Denver U 261; Money, Gaskin and Hull, Impulse, Agression and Sexuality in the XYY Syndrome, 44 St. John’s L Rev 220.)

. Farrell, The XYY Syndrome In Criminal Law: An Introduction, 44 St. John’s L Rev 217, 218.

. Housley, Criminal Law: The XYY Chromosome Complement and Criminal Conduct, 22 Okla L Rev 287.

. See n 7.