THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DAVID ALLWEISS, Appellant.

First Department, January 26, 1978

## APPEARANCES OF COUNSEL

*Paul Lieber* of counsel *(Freda S. Nisnewitz* with him on the briefs), for appellant.

*Edward Agnew McDonald (Peter L. Zimroth* with him on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

### OPINION OF THE COURT

EVANS, J.

Defendant-appellant stands convicted of the murder of Carol Hoffman by stabbing and strangulation. Although there were no eyewitnesses to the murder, the People marshaled substantial direct and circumstantial evidence which convinced the jury beyond a reasonable doubt, that defendant had committed the crime.

Since there were no eyewitnesses, identity was a crucial issue. Vincent St. George, Carol's boyfriend had talked to a man in her apartment and described him as having a "very distinguishable, recognizable, soft-spoken voice". The defendant was identified by St. George as the man he had spoken to, after St. George had had a chance to listen to his voice.

Prior to trial, defendant pleaded guilty to six rapes which he committed within the five-month period prior to Carol Hoffman's murder. The trial court permitted each of these women to testify under the identity exception enunciated in *People v Molineux* (168 NY 264). On this appeal, defendant

argues that the purpose of this testimony was to show defendant's predisposition to commit the crime charged, and that the probative value of this testimony was so far outweighed by the prejudice to the defendant that it deprived him of a fair trial. Perhaps at this point it might be well to set forth the facts of the matter.

Testimony of the People's principal witness, the boyfriend of Miss Hoffman, was that he had called the deceased in this case, and she had asked him to talk to a man in the apartment. A man got on the telephone and told the witness that he was looking for a man who had raped and thrown his wife down a flight of stairs, resulting in a miscarriage. The conversation lasted 10 or 15 minutes, after which the deceased told the witness she would call him back. It was then after 9:00 P.M. The witness, being apprehensive, rushed from The Bronx to Miss Hoffman's apartment in Manhattan and getting no answer, had the superintendent open the door. The victim was lying on the floor with a knife protruding from her stomach. He called the police at 9:40 P.M. Other testimony revealed that a pair of stockings was tied around her neck and that a bureau drawer containing lingerie was open, its contents were in disarray, and some articles were hanging out of the drawer. Detectives removed a strand of hair from the victim's mouth for comparison with the victim's own hair. The victim had also been strangled, and her voice box and several bones around her neck had been broken. Prior to trial, the defendant had pleaded guilty to several counts of rape and related offenses arising from six sexual assaults. In the rape of victim No. 1 the defendant threatened her with a knife and made her remove her clothing; as she was doing so, he was feeling around those drawers which contained her lingerie. Defendant also raped victim No. 2 after threatening her with a knife and handled her lingerie. In the rape of victim No. 3, defendant made her take off her clothes, he went through her dresser drawers and found a slip and made her put it on before raping her. He likewise rifled through victim No. 4's lingerie, made her get undressed, then made her put on a slip before raping her. Victim No. 5 was tied up with pantyhose while defendant went through her lingerie drawer; he then made her put on another pair of pantyhose and a slip before raping her. Defendant went through the dresser drawers of victim No. 6, took out pantyhose, a slip and underpants, made her put on the slip and underpants and then raped her.

Of his rape victims, three lived within a block of the deceased. Defendant had followed all six of his victims into their apartment buildings, and with five, used a ruse to get into the apartment. He grabbed all six of them by the throat during the assault. Four of the women testified that he mentioned or displayed a knife, and two of them were told that his wife or fiancée had been raped and murdered. From four of the women he stole money and personal property, and in all cases he rifled through their lingerie drawers.

Four of the rape victims described the defendant's voice at trial, and their descriptions were consistent with that of the principal witness.

The hair was analyzed by the FBI and found to be from the defendant or some other person whose hair had the same microscopic characteristics.

Later, a handbag was found on the street and given to the police by an unidentified woman. There was no money in it, but papers in it indicated that it belonged to the deceased.

Two men, with whom the defendant resided, testified. One, Holstrom testified that the defendant had moved in temporarily until he could find a job. He also testified that the defendant did not contribute financially to the upkeep of the apartment and ate only brown rice because that was all he could afford. He further testified that when he went to bed at 8:00 P.M., on the night of the murder, the defendant was not at home. The second, Williamson testified that on the night of the murder he left school around 9:00 P.M., he was not sure if he made any stops or which way he walked the one block from his school to his apartment, however, when he arrived home the defendant was there. Defendant and he went to a bar where defendant bought drinks. The next night defendant treated him to movies, food and beer. He was with the defendant when the latter was taken into custody. Later the defendant called him and brought up the subject of when Williamson arrived home on October 23, and stated, "I was home at 9:00".

Defendant now claims that evidence of defendant's prior crimes had a prejudicial effect, and outweighed its probative value. The rule is basic that when a person is charged with one crime, evidence that he committed other crimes is inadmissible if such evidence is offered solely to establish a criminal disposition. "One may not be convicted of one crime on proof that he probably is guilty because he committed another

crime". *(People v Goldstein,* 295 NY 61, 64.) The reason for the rule is one of policy, not of logic. *(People v Zackowitz,* 254 NY 192.)

■ Another crime or crimes of the defendant are not admissible to establish that the defendant committed the crime charged where the only connection between the crimes is a similar *modus operandi.* If, however, the *modus operandi* is sufficiently unique logically to point to the defendant as the perpetrator of the crime charged, evidence of the other crimes is admissible. *(People v Condon,* 26 NY2d 139; *People v Kennedy,* 27 NY2d 551.) That defendant's *modus operandi* was sufficiently unique cannot be seriously gainsaid. He followed his victims, usually single women, to their apartments, employed a ruse to gain entrance, forced compliance with his demands by seizing his victim by the throat and threatening her with a knife. Defendant, in all cases, had manual contact with his victims' lingerie, and in some cases made them undress, then put on lingerie he had selected before raping them. Afterward, he took property from the victim's apartment. The defendant usually mentioned his wife or fiancée, and twice told of his wife or fiancée having been brutalized.

■ When considered in connection with the rapes the *modus operandi* is consistent in nearly every distinctive detail. The other victims were raped, not murdered; however, here we have testimony that Miss Hoffman cried out, indicating a certain amount of resistance, whereas the other victims submitted without outcry. In addition, having spoken to the boyfriend, the defendant felt the need for haste, not knowing his whereabouts, nor how soon the boyfriend would appear on the scene. In all cases he had seized his victims by the throat before they submitted, and Miss Hoffman, having resisted, was found to have been killed by manual strangulation. It would seem then that wrapping the stockings around her neck was either a bit of theatre or a further manifestation of the lingerie fetish. Miss Hoffman was found in a position to be raped, and when the lower part of her skirt was turned up the 11 knife punctures were found to match the punctures in the upper part of her dress. Frustrated in his attempt at rape by the victim's death, he carried out his frustration by stabbing her. Hence, the departure from the usual *modus operandi.*

■ Further, under the rule established in *People v Molineux* (168 NY 264, *supra)* when evidence of another crime tends to identify the person committing it as the same person who

committed the crime charged, it is admissible. *(People v Hill,* 198 NY 64.) Here, the crime in almost every detail identified defendant as the perpetrator in the instant case. The voice identification by the principal witness was in accord with the descriptions given by the other victims. The witness identified the defendant's voice only after hearing it for several minutes, and did not do so compulsively, as he refused to make an identification the first time because of the brevity of his exposure.

█ Without belaboring the point, CPL 470.05 is clear as to when a question is preserved for the purpose of appeal, and it appears here that such was not done as regards the charge pertaining to circumstantial evidence. The trial court charged at length on the question of circumstantial evidence; however, defendant is dissatisfied at the court's choice of words. Such dissatisfaction, aimed at form rather than substance is not warranted.

Although one may be prepared to agree that the admission of Miss Hoffman's pocketbook, without precise details of its procurement, was of questionable value, the trial court was clearly within its discretion as to other evidentiary rulings.

The testimony of defendant's two roommates was also properly admissible since it related to several material facts. The time defendant was absent from his apartment on the night of the murder, his sudden enrichment after the murder, and his suggestion to his roommate that he was in the house at 9:00 P.M. the night of the murder. This testimony was certainly relevant to the issues.

█ Defendant argues the admissibility of the testimony concerning hair samples as inconclusive. It is well-settled law that before scientific evidence is admissible, there must be proof that the reliability of the tests used has gained recognition in the scientific community. *(People v Leone,* 25 NY2d 511.) The reliability of microscopic tests used to compare the specimens of hair has long been recognized. (See FBI Handbook of Forensic Science; see, also, McCormick, Evidence [2d ed], § 206.) In addition, the defense introduced its own evidence.

In assembling the mosaic that is the case, the bits and pieces, no matter how small, must be admitted to form a complete picture. It is then the province of the jury to weigh their significance.

Judgment, Supreme Court, New York County, convicting defendant of murder in the second degree, should be affirmed.

MURPHY, P. J. (dissenting). Prior to this murder trial, the defendant pleaded guilty to raping six different women during the preceding five-month period. Under the "identity" exception set forth in *People v Molineux* (168 NY 264, 313), the trial court permitted the six victims to testify about the circumstances surrounding each rape. Defense counsel initially moved for a mistrial on the ground that there were no similarities between the manner in which the rapes and the homicide were perpetrated. Later in the trial, the parties informed the jury, through stipulation, that the defendant had pleaded guilty to the six rape charges.

Generally, evidence material and relevant to prove a crime charged will not be rendered inadmissible simply because it also tends to establish that a defendant is guilty of a crime other than the one charged. It is equally well established that the prosecution may not prove against a defendant, a crime not charged in the indictment, merely to establish that a defendant has a propensity to commit the crime charged. The probative value of such evidence is generally outweighed by the danger that its admission would create undue prejudice to a defendant and it will, therefore, be excluded. Thus, as a general rule, evidence of an uncharged crime allegedly committed by a defendant should not be admitted if the only connection with the charged crime is a similar *modus operandi*. However, evidence of an uncharged crime could be received if the *modus operandi* were unique. (*People v Condon,* 26 NY2d 139, 143, 144; *Richardson, Evidence* [10th ed], §§ 170, 180.) The narrow question presented upon this appeal is whether the *modus operandi* reflected in the six rape cases was so unique as to warrant its admission in this homicide trial. With that issue in mind, the record will be explored to determine the similarities and dissimiliarities between the events surrounding the rapes and the homicide.

First of all, the defendant gained entrance to five of the rape victims' apartments through various ruses; force was employed in one instance. Since there was no sign of a forced entry in the decedent's apartment, it may also be assumed that her murderer gained entry through subterfuge. Suffice it to say that our prisons are filled with individuals who gained access to apartments through a ruse before they raped, robbed

or assaulted their victims. The use of a ruse is not a singularly distinctive method of perpetrating a crime.

Secondly, in the six rape cases, the victims were threatened with manual strangulation. In three of those cases, the victim was threatened with a knife; a knife was actually displayed by the defendant in a fourth case. Aside from the force used to effect the rapes, none of the victims was otherwise seriously injured. It is true that the decedent had been strangled. However, she had not been raped. Of course, it may be legitimately argued that she was not raped because she resisted her attacker. Nonetheless, a counter-argument may also be fairly made that she was killed because she would not surrender her money. Both arguments are largely speculative. Furthermore, the testimony of the rape victims would tend to indicate that the defendant had his own knife. If that be the fact, it would seem unlikely that the defendant would have sought a kitchen knife to kill the decedent. Again, for purposes of argument, I merely try to point out there is no single thread linking the rapes and the homicide.

Thirdly, the rape victims testified that the defendant had a "lingerie fetish". He forced many of them to put on particular undergarments before the rape; he rummaged through their dresser drawers searching for undergarments; he tied some of them with pantyhose. The decedent had her stockings tied around her neck and the bureau drawers were open with the contents thereof in disarray. Once more, it must be stressed that the prisons and mental hospitals are filled with persons who openly displayed a sexual "hang-up" in perpetrating a particular crime. It may be safe to say that most of the rapists and the other sexual offenders roaming this city are given to sexual aberrations and fantasies of some sort. As a final comment on this point, it is quite possible that the stockings were the most available instrument with which to strangle the decedent. It is possible that the use of the stockings had no sexual connotation at all but were merely used to effect the robbery.

Fourthly, the defendant had stolen money or personal property from four of the rape victims. There was proof below that the murderer had stolen the decedent's pocketbook and the money therein. In one rape case, the defendant had actually offered money to the victim. In other cases, where money had been removed from a wallet, the defendant left the wallet behind in the apartment. If it was the defendant's pattern to

take the money and leave the wallet, it is not understandable why he ran off with the decedent's pocketbook.

Fifthly, it should be emphasized that three of the rape victims lived near the defendant's residence. Three, however, lived quite a distance away on Central Park West. Hence, the proximity of decedent's and defendant's apartments does not show a distinct crime pattern on defendant's part alone. At most, one may fairly say that the defendant, as well as many other criminals, had previously committed offenses in the subject neighborhood.

Sixthly, the rapes were consummated almost immediately after the defendant had gained entrance to the respective apartments. In this proceeding, the murderer engaged in an extended discussion with the decedent directly and with her boyfriend over the telephone. The murderer's actions in this regard were quite different from those of the defendant in the rape cases.

Lastly, the defendant told two of the rape victims that his "wife" and his "fiancée" had been raped and murdered. The murderer had told the decedent's boyfriend that a neighbor in the building had thrown his wife down a flight of stairs, as a result of which she sustained a miscarriage. While there are similarities in the defendant's "stories" and that of the murderer, that tenuous similarity should not serve as a predicate to invoking the "identity" exception under *People v Molineux* (168 NY 264, *supra*).

The similarities between the rape cases and this homicide case are more than counterbalanced by many dissimilarities. Under no fair reading of the evidence can it be said that the *modus operandi* in the homicide case is so unique that it is immediately recognized as that employed in the rape cases. For that reason, the testimony of the six rape victims should have been excluded. Absent the six victims' testimony, the defendant's conviction is then supported, in a very close case, by highly circumstantial evidence. Since the defendant's conviction for murder may well have been prompted and was, at the very least, influenced by the jury's consideration of the uncharged rapes, the judgment of conviction should be vacated and a new trial should be ordered.

BIRNS and LANE, JJ., concur with EVANS, J.; MURPHY, P. J., dissents in an opinion.

Judgment, Supreme Court, New York County, rendered on November 10, 1975, affirmed.