OPINION OF THE COURT
Nicholas Colabella, J.
The defendant is charged in the above-captioned indictment with the crimes of robbery in the first degree, criminal use of a firearm in the first degree, robbery in the second degree, criminal use of a firearm in the second degree and grand larceny in the second degree. On January 4 through 7, an extensive Wade hearing (United States v Wade, 388 US 218) was held.
The following credible evidence was adduced at the hearing:
On the 14th day of July, 1981 at approximately 10:30 a.m. Mark Lederman entered Burkay Jewelers on Mamaroneck Avenue in White Plains to purchase an anniversary *588 gift for his wife. Rick Burton, one of the owners, was discussing prices of jewelry and reviewing a catalogue with a black male while Mr. Lederman waited to speak with him. Also present in the store was Louise Christello, an employee, and another black male. Mr. Lederman observed these individuals for approximately 10 minutes from a maximum distance of 3 to 4 feet. Nothing was covering either individual’s face and the lighting conditions in the store were good.
After approximately 10 minutes, both individuals drew handguns and announced a robbery.
One black male approached Ms. Christello and placed a handgun on the counter with his hand on it. He then ordered her to lay on the floor behind the counter. All three black males then proceeded to take items of jewelry for approximately 20 minutes. During this period they ordered Ms. Christello to get up at various times and open different jewelry cases. At one point, one of them stated to her “where’s the safe, lady?”
After the robbery, Burton, Christello and Lederman went to White Plains police headquarters where they viewed between 400 to 1,000 mug shots.
None of the witnesses made a positive identification of anyone at this time.
On the 18th day of July, 1981, Detective Giglio showed a photo array consisting of eight photos to Rick Burton which contained a photo of the defendant which was obtained from the Plain view, New Jersey Police Department and was taken in 1978-1979. Mr. Burton could not identify anyone from the array.
On the 20th day of July, 1981, this same array was shown to Mark Lederman. After viewing it, he too failed to make any identification.
On the 23rd day of July, 1981, this same photo array plus an additional array consisting of 10 loose photos was shown to Burton, Christello and Lederman. The defendant’s photo was in the first array. Burton and Christello stated defendant’s photo looked like one of the perpetrators but they and Lederman failed to make a positive identification.
*589 On August 10,1981, Detective Frank Lanza of the White Plains Police Department showed a photo array of six photos to Burton and Lederman. In this array was a photo of the defendant in position No. 3. Burton again stated photo No. 3 was similar to a perpetrator but that he had to see the person in a corporeal manner. Lederman failed to make an identification.
On October 6, 1981, Detective Robert DeFazio showed a photo array consisting of six color photos to Mr. Burton at Burkay Jewelers. In position No. 4 in this array was a photo of the defendant obtained from the Los Angeles Police Department where the defendant had been arrested in September, 1981. Burton viewed the array and stated, except for the hair length, photo No. 4 was one of the gunmen.
On the same date, Lederman viewed the same array at the White Plains Police Department. He failed to make an identification after viewing the array for 10 minutes. Detective DeFazio told him to “Take his time and look again”. Lederman told DeFazio that No. 4 was similar to one of the perpetrators but that he wanted to see him in person. DeFazio told Lederman that if he could arrange to have the subject placed in a lineup, he would notify Lederman. Ms. Christello viewed the array that night at her home. She stated “I remember those eyes” and picked out the photo of the defendant.
On July 12, 1982 a lineup was conducted at the White Plains Police Department.
Burton picked out a Vernon Wells when he viewed the lineup.
Lederman viewed the lineup and asked to have each subject state “where’s the safe, lady?” He identified the defendant as a perpetrator. He stated, however, that he knew one of the participants to be a White Plains police officer.
Ms. Christello then viewed the lineup. She identified the defendant.
Dr. Robert Buckhout testified as to his research in the field of memory and witness identification. It was Dr. Buckhout’s opinion that the photo arrays used in this case *590 were defective. The repeated showing of the defendant’s photo, according to him, “created” memory. Also, he testified that once , memory is tainted, it is lost forever and cannot be rehabilitated.
CONCLUSIONS OF LAW
The narrow issue before this court is whether the identification procedures utilized in this case were unduly suggestive. Each case must be decided on its own facts (Simmons v United States, 390 US 377). Suggestiveness must be determined after reviewing the “totality of the circumstances” (Stovall v Denno, 388 US 293, 302).
Turning first to the composition of the photo arrays in question, it appears that, as to each array, the police assembled a sufficient number of photographs which were substantially similar in many respects. Thus, the photo arrays, in and of themselves, were not suggestive.
The conduct of the police in displaying the photos to the witnesses presents a different situation. The police obviously used the same photograph of the defendant in different arrays and repeatedly showed the witnesses these arrays. Courts in other jurisdictions have found that this practice, although not recommended, may not under the circumstances of each case be unduly suggestive. (See United States v Marchand, 564 F2d 983, cert den 434 US 1015; State v Thompson, 37 NC App 651; Sobel, Eyewitness Identification [2d ed], § 5.3[b].) Other courts have held that duplicate displays of the suspect’s photo were suggestive but that this fact is not sufficient standing alone to preclude an in-court identification where the witness had an independent source (United States v DiPalermo, 606 F2d 17, cert den 445 US 915; People v Ware, 78 Cal App 3d 822).
In this particular case, the court finds under the circumstances before it, the repeated showing of the defendant’s photo was not proper. While the court finds the testimony credible that there was basically no overt suggestiveness in the display of these photos, it cannot be said that there was no suggestiveness present. The police conduct in asking Mr. Lederman at one point to “take his time and look again” was certainly suggestive. The suggestiveness here does not come from any intentional acts on the part of the *591 police to have the witness pick out this particular defendant, but it is clear that they intended that a photo should be identified.
The court therefore will suppress the photo identifications utilized in this case. This ruling is not based solely on the fact that the defendant’s photo was repeatedly shown to the witnesses. Rather, based upon all the circumstances present before this court, it is the opinion of this court that the photo identification procedures utilized were unduly suggestive.
Turning now to the corporeal identification, the foregoing principles also apply.
The lineup in this particular case shows that the participants were substantially the same in all respects, such as age, skin complexion, hair style and length and clothing. In an effort to minimize discrepancies, all the participants were seated, thus making the heights of the participants similar. Counsel for the defendant was present and participated in the conduct of the lineup (People v Blake, 35 NY2d 331).
That is not to say, however, that this lineup was proper. There are a number of factors to be considered in the determination of the suggestiveness of a particular lineup. Here, the lineup consisted of the defendant, police officers and City of White Plains employees. Mr. Lederman knew one “filler” in the lineup was a police officer. He had also been told some time prior to the lineup that if the individual he tentatively identified from a photo could be placed in a lineup, that Lederman would be called to view it. Obviously, in any lineup, a witness, will assume that a suspect is present somewhere in the lineup. This will not, in and of itself, necessitate an otherwise valid lineup to fall. However, here Lederman was able to positively eliminate at least one filler from the lineup. The testimony also revealed that the other employees and police in the lineup had duty stations in the vicinity of the location of this incident. Moreover, after the lineup Ms. Christello was told that she “did good” and identified the right individual. This fact will certainly affect the suggestiveness of a lineup (United States ex rel. Stevenson v Mancusi, 409 F2d 801).
*592 Based, therefore, on all of the circumstances previously discussed, this court will suppress the use of the pretrial identifications for use on the People’s direct case.
A different result is warranted with respect to the questions of independent source. Both Mr. Lederman and Ms. Christello had a clear image of the person who robbed the store (Coleman v Alabama, 399 US 1; People v Harrington, 29 NY2d 498; People v Fuller, 71 AB2d 589). Both individuals had ample time to observe this defendant both before and during the robbery under good lighting conditions and at very close distances. The question of whether an independent source has been established is a factual one for determination by the trier of fact (People v Burnett, 81 AD2d 868). Keeping in mind that the limited issue before this court involves the admissibility of this testimony, the court finds that Mr. Lederman’s and Ms. Christello’s image of the person who committed this robbery had a source independent of any photographic or corporeal identification procedure (Coleman v Alabama, supra; People v Rahming, 26 NY2d 411; People v Gonzalez, supra). The weight to be given this evidence is ultimately to be determined by the jury.
Accordingly, it is the decision and order of this court that both Mr. Lederman and Ms. Christello will be allowed to make an in-court identification of this defendant (People v Whisby, 48 NY2d 834; People v Thomas, 51 NY2d 466).
One further issue is left for the court’s determination. The defendant offered the testimony of Dr. Robert Buckhout as an expert in the field of memory, perception and its relation to identification testimony. This court allowed his testimony at this hearing for the purpose of aiding the court in its determination of the issues before it. His testimony was interesting and in some respects helpful. His ultimate opinion, however, and the premise underlying that opinion must be rejected by the court. It is the decision of this court that Dr. Buckhout’s testimony regarding identification witnesses, perception and memory cannot be admitted in this State as expert witness testimony. “It may be broadly stated as a general proposition that there are two classes of cases in which expert testimony is admissible. To the one class belong those cases in *593 which the conclusions to be drawn by the jury depend upon the existence of facts which are not common knowledge and which are peculiarly within the knowledge of men whose experience or study enables them to speak with authority upon the subject. If in such cases, the jury with all the facts before them can form a conclusion thereon, it is their sole province to do so. In the other class we find those cases in which the conclusions to be drawn from the facts stated, as w.ell as knowledge of the facts themselves, depend upon professional or scientific knowledge or skill not within the range of ordinary training or intelligence” (Dougherty v Milliken, 163 NY 527, 533).
Three questions must be considered in any determination on the admissibility of an expert’s testimony:
(1) Is the subject in question one upon which the opinion of an expert can be received?
(2) What are the qualifications necessary to entitle a witness to testify as an expert?
(3) Does the potential witness meet those qualifications? (Richardson, Evidence [Prince, 10th ed], § 367.) Additional criteria include relevancy of the testimony to an issue in the case and whether the testimony will aid the jury.
Applying these principles to this case, the court determines as a matter of law that Dr. Buckhout’s testimony is not admissible at the trial of this matter. Although his testimony regarding “weapon focus” and loss of memory may not be within the common knowledge of a jury, such factors do not, in and of themselves, require the conclusion that an expert is necessary to explain them on the issue of identification. Dr. Buckhout certainly appears to possess the requisite educational background in his field of inquiry. However, there was no showing that Dr. Buckhout’s research has reached the level of general acceptance in the field of scientific inquiry (Frye v United States, 293 F1013).
The language of the Court of Appeals in its discussion of the polygraph is particularly apt in this case: “[W]e should be most careful in admitting into evidence the results of such tests unless their reasonable accuracy and general scientific acceptance are clearly recognized” (People v Leone, 25 NY2d 511, 518; see, also, People v Allweiss, 48 NY2d 40; People v Middleton, 54 NY2d 42).
*594 The reliability of such tests moreover has not been established to this court’s satisfaction. Such reliability is a determination which the court must make (People v Leone, supra). Although Dr. Buckhout has testified in other courts of this State, there appears to be no reported decision wherein this type of testimony has been found to be reliable or acceptable in the scientific community. In United States v Watson (587 F2d 365, cert den 439 US 1132), the defense sought, as here, to introduce “expert” testimony on the unreliability of cross-racial identification. In United States v Fosher (590 F2d 381) there was an attempt, as here, to introduce “expert” testimony regarding eyewitness identification in general. Both courts rejected this testimony on the grounds that the reliability of such testimony has not been sufficiently established to warrant its admission into evidence at trial. Therefore, while Dr. Buckhout may be very learned in this particular field, as a matter of law he cannot be considered as an “expert” for evidentiary purpose.
There exists a more compelling reason for the preclusion of this evidence. It has long been established law that the reliability of identification evidence is what primarily determines its admissibility (Manson v Brathwaite, 432 US 98). This determination is made by a court at a hearing and its credibility and weight is for a jury to determine. To allow expert testimony on the issue of so subjective a subject such as memory or reliability would be to usurp the province of the finder of fact, be it the court or the jury. (United States v Fosher, supra; People v Valentine, 53 AD2d 832; People v Suleski, 58 AD2d 1023.) The ultimate determination of the credibility of an identification witness testimony is, quite properly, the sole province of the jury and should not be tempered by any outside influences such as opinion testimony. To do so would fly in the face of the established law in this State.
For the foregoing reasons, it is the decision of this court that, as a matter of law, Dr. Buckhout’s testimony will not be permitted into evidence at the trial of this matter.