OPINION OF THE COURT
Penny M. Wolfgang, J.
This is an appeal from an order of the Town of Tonawanda Justice Court entered on March 8, 1983 which precluded from use at trial the results of a certain breathalyzer test performed upon the defendant and further dismissed the charge of driving with more than .10% blood alcohol as charged under subdivision 2 of section 1192 of the Vehicle and Traffic Law.
On October 2, 1982 at approximately 11:30 p.m., the defendant was arrested by a Town of Tonawanda Police Officer and charged with driving while intoxicated. Approximately one-half hour later at 12:03 a.m., a breathalyzer test was administered to the defendant. The test results indicated that the defendant had more than the requisite .10% by weight of alcohol in his blood.
Defendant moved for suppression of the breathalyzer results claiming among other grounds, a lack of reliability *1041 of the breathalyzer unit used by the Town of Tonawanda Police Department. His claim was based upon information contained in an advisory letter issued on September 10, 1982, by Smith and Wesson, the manufacturer of the breathalyzer machine. The advisory letter, which will be more fully discussed later, was to the effect that the possibility existed that radio frequencies from outside sources might interfere with the test results of a given breathalyzer unit. In order to determine whether any given breathalyzer instrument was so affected, the manufacturer outlined a step-by-step testing procedure.
On January 19,1983, a suppression hearing was held to determine, among other things, the reliability of the breathalyzer. The police officer who conducted the test testified as to the operation and calibration of the machine and laid the foundation for the certificates involving the simulator solution and ampuls. Another officer, certified as a breathalyzer operator and repairman, testified both as to the periodic calibrations which are done on the particular machine in question and as to the weekly simulator tests conducted. Both officers testified that the machine used by their police department was working properly and was always within tolerance. There was further testimony that the breathalyzer unit was tested for possible radio frequency interference in the manner prescribed by Smith and Wesson. The test results indicated that the breathalyzer unit in question was not so affected. In a decision dated February 26, 1983, the Town of Tonawanda Justice Court suppressed the breathalyzer test results on the ground that a doubt was raised as to the validity of the said results based upon the Smith and Wesson letter.
The issue this court must determine is whether or not the trial court imposed an incorrect standard of admissibility when it suppressed the test results.
THE THEORY AND OPERATION OF THE BREATHALYZER
In order to make a proper determination in the instant matter, it is incumbent upon the court to fully appreciate the scientific theories and operation of the breathalyzer instrument used by the Town of Tonawanda Police Department. A condensed theory of the instrument has been provided by Smith and Wesson and reads as follows:
*1042 The method consists of three principal phases:
(1) Collecting a sample of deep-lung breath.
(2) Passing this sample through a potassium dichromate — sulfuric acid solution.
(3) Measuring the amount of potassium dichromate required to oxidize the alcohol.
The first phase involves having the subject blow, with force, through a mouthpiece into a heated plastic tube. The breath raises a piston in a metal cylinder. When the piston reaches the top of its stroke, it is held in this position by a small magnet aligned with two fixed-pole pieces. Two vent holes just below the piston permits the breath to escape so that, when blowing is stopped, the cylinder is full of the last breath. When blowing stops, the piston drops from its supporting iron plate sufficiently to cover the vent holes.
A special valve is incorporated in the top of the sample chamber. It is designed to make leaks virtually impossible. The valve and magnet operate on the same shaft, rotated by the control knob on the panel. When the valve is in the take position, the breath passes from the retractable sample tube to the sample chamber. The magnet is aligned with the fixed pole pieces and the piston is supported. When the valve is turned to analyze, the magnet is disaligned with the fixed pole pieces, and the piston, by its own weight, forces the measured amount of air through 3 milliliters of 50% (by volume) sulfuric acid in water, containing 0.25 milligrams of potassium dichromate per milliliter, and a catalyst.
The sample chamber contains 56.5 milliliters. This is necessary because the breath is raised from mouth temperature (about 34 degrees centigrade) to 50 ± 3 degrees centigrade. The 52.5 milliliters of breath will occupy a larger volume at this higher temperature. Also, the delivery tube from the sample chamber of the test solution is full of room air before the test and full of breath after the test. This volume must be added to the cylinder volume. This adds up to approximately 56.5 milliliters. The breath bubbles through the test solution in about 30 seconds. One and a half minutes later, the reaction is complete.
Before the test is started, the solution in the “test” ampul is balanced photometrically against a reference ampul. *1043 The reading light is moved back and forth between the two ampuls until the null meter centers. This indicates that each of the two photocells is receiving the same amount of light through the ampuls. At this point the blood alcohol pointer is set on the base line of the scale. After the analysis, the reading light is again turned on. If part of the potassium dichromate has been consumed by alcohol in the test ampul, more light will reach the right-hand cell and the null meter will no longer be centered.
The light is moved by the thumb wheel until the balance is again established as indicated by the centering of the null meter. The distance the light was moved is directly proportional to the amount of potassium dichromate used, and this is directly related to the amount of alcohol in the breath. The scale is calibrated in per cent blood alcohol.
With this arrangement, when the photometer has been balanced for a reading, line voltage affects each ampul and photocell the same so changes in the voltage make no difference. For the same reason, changes in intensity of the reading light make no difference. The actual output of the photocells makes no difference because they are balanced before each test. The strength of the test solution is unimportant, because only the potassium dichromate used in the test is measured. Thus, the instrument is not dependent on external conditions. The only factor that must be maintained is the accurate volume of the test solution. A special gouge is provided to check this volume in each ampul.
THE STANDARD APPLICABLE TO THE ADMISSIBILITY OF EVIDENCE BASED UPON SCIENTIFIC TESTS
The standard for admissibility of scientific evidence had its genesis in the landmark case of Frye v United States (293 F 1013) in 1923. In Frye, the appellate court was asked to consider the admissibility of a primitive lie detector device. The court rules that the exculpatory results of the lie detector had been properly excluded in that the scientific principle and technique sought to be admitted had not been sufficiently established so as to have been generally accepted in the particular field to which it be *1044 longed. Further, the court indicated (at p 1014) that this forerunner of today’s polygraph had not passed from the experimental to the demonstrable stage.
The standard imposed by Frye (supra), which became the law of the land, was adopted in 1937 by Wigmore, Evidence (3d ed, vol 3, § 990) and was relied upon in People v Leone (25 NY2d 511) the leading New York State case. In People v Leone, the Court of Appeals reiterated the standard applicable to evidence from scientific tests. “Although perfection in test results is not a prerequisite to the admissibility of evidence obtainable by the use of scientific instruments, the rule has been to grant judicial recognition only after the instrument has been sufficiently established to have gained general acceptance in the particular field to which it belongs. (Wigmore, Evidence [3d ed.], § 990.)” (25 NY2d, at p 517.)
While earlier cases concerned themselves with the admissibility of lie detector evidence (People v Leone, supra) and with cases involving speed-detection devices utilizing radar (People v Magri, 3 NY2d 562), as science and technology advanced, the Frye/Leone standard became applicable to breathalyzer test results (People v Donaldson, 36 AD2d 37).
In Donaldson (supra) the defendant having been convicted of operating a motor vehicle while in an intoxicated condition, appealed his conviction claiming that the results of his breathalyzer test had been improperly received into evidence. It was his contention that there had been no showing that the breathalyzer is scientifically reliable and that there had been no proof at trial that the test was properly conducted by a qualified operator in accordance with required rules and regulations. As concerns the scientific reliability of the breathalyzer, the court ruled as follows (p 40): “it is no longer necessary to require expert testimony to establish the general reliability of the machine. We liken the question presented to that raised in People v. Magri (3 N Y 2d 562) as it related to the use of radar in speed detection. There, in determining that it was no longer necessary to require expert testimony in each case as to the nature, function or scientific principles underlying the radar speedometer, the court observed (p. *1045 566) that ‘Almost daily, reproductions by photography * * * X rays, electroencephalograms, electrocardiograms, speedometer readings, time by watches and clocks, identity by fingerprinting, and ballistic evidence, among a variety of kindred scientific methods, are freely accepted in our courts for their general reliability, without the necessity of offering expert testimony as to the scientific principles underlying them.’ Hence, we think the time has come when we may recognize the general reliability of the Breathalyzer as a device for measuring the concentration of alcohol in the blood, and that it is not necessary to require expert testimony as to the nature, function or scientific principles underlying it * * * Moreover, by providing that the results of the chemical analysis of breath tests are admissible into evidence * * * the Legislature has obviously determined that breath tests, if conducted in accordance with proper procedures, are scientifically reliable for determining the percentage of alcohol in the blood.”
Thus, the courts have recognized that the scientific principles upon which the operation of the breathalyzer is based are both valid and sound.
Having established the general reliability of the breathalyzer, the appellate courts of our State have determined that the results of breathalyzer tests shall be admitted into evidence where the testing has been performed (1) in accordance with the procedures outlined in the manufacturer’s instruction manual, (2) by a qualified operator, (3) using a machine which has been properly calibrated in accordance with the manufacturer’s specifications, (4) with chemicals of the proper proportion and (5) pursuant to the rules and regulations of policy agency. (See People v Donaldson, supra; see, also, People v Gower, 42 NY2d 117.)
THE SMITH AND WESSON LETTER
On September 10, 1982, Smith and Wesson Electronics Company, manufacturers of the breathalyzer unit in question (model 900A), issued a “Customer Advisory”. The advisory states, in part, as follows: “Since the inception of evidential breath-testing for alcohol, changes have taken place in communications equipment used by law enforcement agencies. Radio transmissions, especially within the last few years, have increased significantly in number, *1046 broadcast frequencies, and power levels, resulting in an increase in the potential for radio frequency interference (‘RFI’) in the normal operation of electronic equipment. This includes some breath-testing instruments. However, because the ‘window of susceptibility’ to RFI during the test cycle of breathalyzer instruments is narrow — limited to a coincidence of specific frequencies and signal strengths during a restricted time interval — it should not be assumed that past test results were necessarily distorted even in the presence of some radio frequency energy.”
The advisory goes on to state that “continuing investigation now suggests this early series of breath-testing instruments (Models 900 and 900A) may be affected in an unpredictable manner by various frequencies and power levels. Further, the extent of sensitivity to particular frequencies and particular power levels will vary from instrument to instrument. Since test conditions were representative of some police environments, the possibility exists, although unlikely, for higher or lower than normal test results. Therefore, each instrument should be tested on location in accordance with test one and test two procedures outlined in this advisory.”
The manufacturer then describes, in detail, two series of tests to determine possible interference by “steady source radio frequency energy originating from such sources as AM/FM Radio Stations, TV Broadcasts, Military Installations, etc.” and by “radio frequency energy originating from base-station transmitters.”
THE DECISION UNDER REVIEW
Testimony at the suppression hearing conducted by the Town Justice indicates that the breathalyzer unit used by the Town of Tonawanda Police Department was periodically tested with no sign of error. The instrument was calibrated in April of 1982 and again in November of 1982. No adjustments were necessary on either occasion. At each of the weekly simulator tests immediately preceding and following the defendant’s October 2,1982 test, the breathalyzer unit gave three perfect .10% readings when tested with a .10% simulator solution. At the simulator test performed immediately after the defendant’s test, the breathalyzer instrument again produced a perfect .10% *1047 reading. Approximately one month after the defendant’s test, the machine was fully tested in accordance with the procedures outlined in the advisory letter. The officer conducting the tests determined, as a result of the procedures prescribed by Smith and Wesson, that the various radio frequencies which were the subject of the advisory were causing no interference whatsoever with the particular breathalyzer unit in question.
Notwithstanding the above uncontroverted testimony, the court ordered the breathalyzer test results suppressed. In a written decision dated February 26, 1983, the court stated in applicable part, as follows:
“In our system of Criminal Justice, it is axiomatic that a defendant is presumed innocent until proven guilty beyond a reasonable doubt. The very fact that the manufacturer conducted tests ‘earlier this year’ (1982) which indicated no problem and then conducted tests later the same year and found that ‘this early series of breath testing instruments may be affected in an unpredictable manner’ raises a doubt in my mind as to the validity of any series of tests the manufacturer may devise.
“Unless and until some independent agency evaluates the Smith and Wesson Breathalyzer and its susceptibility to RFI (Radio Frequency Interference) and rules out any possibility of error, I cannot feel comfortable in relying on its test results.”
It is the opinion of this court that the court below imposed an improper standard as to the admissibility of scientific evidence. An examination of the suppression hearing transcript demonstrates that the District Attorney showed the machine to be in proper working order (see People v Todd, 38 NY2d 755, 756). It is not necessary that the perfection of the machine be proven beyond all doubt. Reasonable proof of its accuracy has been established.
If we are to accept the manufacturer’s word that a potential problem exists which might lead to inaccurate test results, we must also accept the manufacturer’s recommendations as to testing procedures to determine if such a problem actually exists as to any given machine. To do otherwise would be to place an unfair burden upon the People. The testing procedures would otherwise be endless. *1048 As stated by Justice Lyman H. Smith (People v Stephens, 52 Misc 2d 1070, 1072) when determining the admissibility of a speed-testing device, “Beyond such simple tests must lie tests of the devices used to test other measuring devices. Beyond these tests must lie metal fatigue tests, conductivity tests, and electrical time-lag tests involving the variant components used in all of the testing devices, and so on and on. These tests must end somewhere. The oft-heard layman’s opinion that the enforcement of the law can be frustrated by a ‘legal bag of tricks’ must not be encouraged by slavish adherence to hypertechnical requirements of myriad testings of the components of every device used to measure accuracy of every other measuring device.”
This opinion is not to say that the issue of possible radio frequency interference should be ignored. This, like any other relevant evidence, should be presented to the jury, as finders of fact, so that they might weigh its value and take it into consideration when making their final determination. Clearly that is a proper function of the jury. As stated in People v Daniels (102 Misc 2d 540, 552, supra): “todays juries are different from the juries of days gone by. Their educational background is better, they are very attentive, widely read and on the whole more knowledgable. They are capable of consuming all kinds of evidence and sorting out the evidence which is believable from the incredible”.
The breathalyzer has long been acknowledged as a valuable and effective tool by law enforcement. It has also been recognized by the courts as a reliable scientific instrument. It should not be excluded from evidence solely upon the “possibility” that it “might” be affected by outside factors. The People have established the reasonable accuracy of the breathalyzer in question, and have met the limited burden as to the initial admissibility of scientific evidence. The scientific principles upon which the operation of the breathalyzer is based remain valid.
It would be neither proper, reasonable, or in the interests of justice to impose a new and stricter standard for the admissibility of scientific evidence, be it the breathalyzer or any other, solely because the “possibility” of outside interference makes the court “uncomfortable” with the procedure. The evidence must be submitted to the jury for *1049 its consideration in weighing the facts and determining whether the People have established the guilt of the defendant “beyond a reasonable doubt”.
DECISION
Based upon the above, the order of the Town of Tonawanda Justice Court suppressing the breathalyzer evidence is hereby reversed and the matter is remanded for further proceedings in accordance with this decision.