*754 OPINION OF THE COURT
Betty D. Friedlander, J.
Defendant makes three arguments in his motion to set aside the verdict pursuant to CPL 330.30. For the reasons outlined below, the court rejects each of the defendant’s arguments and therefore denies defendant’s motion.
(1) First, defendant argues that he was denied due process of law by the prosecution’s failure to record, preserve and disclose the substance of the conversation with defendant which, according to the testimony of the other participant, the State Police investigator who was wired for sound at the time of the transaction, resulted in the sale of drugs by defendant to the investigator. As to this point, the court concludes that neither the recording requirements of title 18 (§ 2518, subd [8], par [a]) of the United States Code, upon which defendant relies, nor the general disclosure requirements delineated in Brady v Maryland (373 US 83) as applied in New York under CPL 240.20 (subd 1, par [g]) mandate the recording, preservation, or disclosure of conversations in which defendant had no legitimate expectation of privacy.
The only requirement for recording conversations under title 18 (§ 2518, subd [8], par [a]) of the United States Code and its New York equivalent, CPL 700.65, relates to eavesdropping warrants, which the police do not need in order to authorize the “body wire” worn by and with the consent of one participant in a conversation (US Code, tit 18, § 2511, subd [2], par [c]; United States v White, 401 US 45; People v McGee, 49 NY2d 48). In addition, the court notes that the disclosure requirements of the Jencks Act (US Code, tit 18, § 3500), including the “duty of preservation” articulated in United States v Bryant (439 F2d 642, 651), upon which defendant relied in oral argument — as a Federal rule preempting State procedure in the area of electronic eavesdropping, a proposition this court finds questionable even under People v Teicher (52 NY2d 638), which found Federal wiretap standards pre-emptive only as to the warrant provision of section 2510 et seq. of title 18 of the United States Code — apply to electronic interceptions only if they are “recorded contemporaneously with the making of [an] oral statement” (US Code, tit 18, § 3500, subd [e], par [2]), *755 by a prosecution witness. The very fact that the Jencks Act delineated the category of interceptions requiring disclosure indicates that interceptions outside that category could exist and would not be subjected to disclosure. In particular, interceptions which were not “recorded contemporaneously” — which the prosecution had never “gathered and taken possession of” by recording in the first place (see United States v Bryant, 439 F2d, at p 651) — are not required by statute to be preserved or disclosed. Indeed, the Bryant court suggested that interceptions which were neither “gathered” nor “possessed” by the prosecution — intentionally unrecorded eavesdropping on an undercover agent’s conversation for “strictly protective” reasons — were not only permissible but less problematic than recordings which were later destroyed (see 439 F2d, at pp 646-647, n 3). Hence the court concludes that the duty of preservation established under Federal statutory law is inapplicable in the instant case.
Nor does State statutory law require the recording of conversations between a “wired” officer and criminal suspect, either under the warrant provisions for intercepted communications (see CPL 700.05, subd 3), or the disclosure provisions for statements of the defendant (CPL 240.20, subd 1, par [a]) or for recordings which the People intend to introduce at trial (CPL 240.20, subd 1, par [f]). The court notes, in particular, that while CPL 240.20 (subd 1, par [a]) has been construed in light of Federal rules of procedure to include recordings of conversations during the commission of a crime (see People v Zacchi, 69 Misc 2d 785), it has not been held to require disclosure where the People, as here, have disclaimed the existence of any such recorded statement (People v Inness, 69 Misc 2d 429); and even if the analogy between CPL 240.20 (subd 1, par [a]) and subdivision (a) of section 16 of the Federal Rules of Criminal Procedure (US Code, tit 18, Appendix) warrants interpretation of the New York law in light of the standards applied by the Bryant court, the Bryant decision {supra) requires only preservation of existing recordings, not the initial recording of “wired” conversations.
Finally, the imposition of sanctions for violation of the duty of the police to preserve and disclose material evi *756 dence under Brady v Maryland (373 US 83, supra), as construed in United States v Bryant (439 F2d, at p 652, supra), is not appropriate in a case which involves neither negligent nor intentional bureaucratic destruction of preexisting material but, rather, a decision as to the need for recording in the course of investigation. Of course, as Bryant makes clear, the early decisions of government investigators are not free from judicial supervision; the duty to preserve “vital evidence” arises once the government investigators have “first gathered and taken possession of the evidence in question” (439 F2d, at p 651), so that, from that point on, neither a history of negligent handling nor a policy of systematic disposal justifies a failure to disclose material evidence on demand. But it is one thing to require the preservation and disclosure of tapes already made; it is another to require the recording of each and every conversation held between a “wired” investigator and a criminal suspect, merely so that the suspect who becomes a defendant can have the opportunity to verify the investigator’s testimony as to the transaction between them. This court is unwilling to second-guess these investigative decisions, especially in light of the sworn statements which indicated that the officers who overheard the conversation transmitted by the undercover trooper’s “body wire” decided not to record it because the quality of the transmission was poor and the need for recording a routine transaction, monitored only to assure the safety of the “wired” trooper, was minimal. (Even the Bryant court, reviewing the decision of the Trial Judge to whom the case was remanded, agreed that on balance the unintelligibility of the tapes outweighed the negligence involved in their loss, United States v Bryant, 448 F2d 1182.) Were the court to transform the duty to disclose into a general duty to record in these circumstances, it would open the floodgates for innumerable motions for suppression or dismissal grounded on instrumental malfunction and erroneous decision making under pressure of field conditions.
For the same reason, the court rejects defendant’s contention that United States v Augenblick (393 US 348), as construed in Bryant (439 F2d, at p 1182, supra), mandates *757 a hearing as to the police procedures governing the recording and preservation of intercepted evidence. While routine procedures may illuminate the degree of negligence or intentionality involved in the bureaucratic destruction of tapes, this court is unwilling — merely on the strength of the Bryant court’s subsequent finding (United States v Bryant, 448 F2d 1182, supra), that the District of Columbia’s police procedure involved recording as well as preservation — to monitor and regulate the field recording practices of the State Police, especially when there was adequate explanation of police practice (and of any apparent contradiction in the Assistant District Attorney’s at-trial revelation that Trooper Stark had apprised him of the possibility that a tape existed) in Inspector Mastronardi’s sworn statement that the special investigations unit did not have the resources to record routine transactions and Trooper Stark’s sworn statement that he knew he was “wired” but would not know whether his “wire” transmission was being recorded.
Hence the court concludes that there is no question of fact which a further hearing would illuminate, and that the failure to record requires neither the suppression of evidence as to the unrecorded conversation nor the setting aside of the verdict.
(2) As his second grounds for setting aside the verdict, defendant argues that the opinion testimony of the police chemist should have been stricken for failure to preserve the test graphs upon which the chemist’s opinion — that the substances allegedly sold by defendant were cocaine and methaqualone — was based.
As to this point, the court finds that defendant was not prejudiced in his trial strategy nor in the outcome of the case by the People’s failure to preserve or disclose the test graphs, so that the sanctions considered in United States v Bryant (439 F2d 642, supra) need not apply in the instant case.
The court reads Bryant (supra) and its New York progeny, particularly People v Richter (102 Misc 2d 285), to hold, first, that the People and their agents have a duty to preserve discoverable evidence (see analysis in United *758 States v Bryant, 439 F2d, at p 647; and see summary in United States v Bryant, 448 F2d 1182, 1183, supra); and second, that the duty to preserve is not to be defeated by either negligent or intentional destruction of evidence. Unlike the Bryant court, however, in determining whether the imposition of sanctions for violation of the duty to preserve is necessitated in a particular case, this court need not address the threshold questions — whether the material which was admittedly destroyed by the People’s chemist was “discoverable” under statutory and constitutional discovery requirements; whether the failure to preserve was intentional, or the result of good faith to preserve was intentional, or the result of good faith inadvertence — for the People do not contest defendant’s arguments with respect to the discoverability of and duty to preserve the graph. Rather, the People argue that even if the destruction of the graph was error — in that the test graph would seem to be discoverable under CPL 240.20 (subd 1, par [c]), which requires the discovery of “[a]ny written report or document, or portion thereof, concerning a * * * scientific test or experiment,” or CPL 240.20 (subd [1], par [g]), which requires the discovery of materials disclosable under Brady v Maryland (373 US 83, supra) while the intentionality of the graph’s destruction was apparent from the police chemist’s testimony that the retention of the graph was “not the policy” of the police lab — the failure to preserve was not prejudicial to defendant, because the physical evidence upon which the tests were done was available for discovery and testing by the defendant (see People v White, 40 NY2d 797).
The court is constrained to agree with the People’s argument. While the cases cited by defendant suggest that the failure to preserve requires the imposition of sanctions when it vitiates defendant’s ability to cross-examine the People’s expert, the defendant in the instant case had the opportunity to conduct defense tests on the substance itself and — by means of his own expert — to challenge not only the lab techniques of the police chemist but the results produced by those techniques, despite the destruction of test data upon which defendant might have based cross-examination as to the adequacy and accuracy of the police *759 chemist’s work. (See People v Prince Jagendorf Greene, 7 NY2d 42.)
This opportunity distinguishes the case from People v Daugherty (County Ct, Schuyler County, June 9, 1980), a drug case in which the police chemist, in routinely disposing of test solutions, simultaneously destroyed not only the test media and the graphs upon which test results rested but the drug itself, so that any basis for cross-examination by defendant was effectively eliminated. Similarly distinguishable are cases involving the loss or destruction of testing tools — breathalyzer ampoules (see People v Richter, 102 Misc 2d 285, supra); or photographic plates (see United States v Bruno, 333 F Supp 570) — which undergird expert opinion as to the identity or composition of evidence by nature ephemeral, such as the alcoholic content of human breath or the chemical content of ink. And equally distinguishable are the cases, like Bryant (supra), in which the lost or destroyed material was the only recording — by tape or notes — of a conversation or transaction which by nature leaves no physical “artifact” for subsequent testing.
Of course, the court does not suggest that the People are relieved of the duty to prove beyond a reasonable doubt that the tests used by their chemist were scientifically reliable or correctly administered (People v Donaldson, 36 AD2d 37). Nor does the court suggest that the defendant can be deprived of his right to rebut the People’s proof by suppression of evidence which might lead a jury to entertain a reasonable doubt about defendant’s guilt, under Brady v Maryland (373 US 83, supra). But where the People have made out a prima facie case and defendant has access to evidence upon which to base cross-examination as to the accuracy of the chemist’s tests, the court concludes that the People’s failure to preserve and to disclose a test graph created during a test run was harmless to defendant, whether the alleged error rose to constitutional or merely statutory dimension (see People v Crimmins, 36 NY2d 230).
(3) Defendant’s third argument challenges the adequacy of the foundation laid for the police chemist’s opinion that the substances allegedly sold by defendant were metha *760 qualone and cocaine. Defendant’s argument rests on the claim that the chemist compared graphs produced by infrared spectroscopy of subject samples, not with a known sample, but with graphs depicted in a publication not produced in court and lacking official certification.
The court rejects defendant’s argument, finding adequate foundation for the chemist’s opinion in the testimony relating to both the professional acceptance of the DEA’s published graphs as reliable bases for a professional opinion as to the infrared spectroscopic identification of drugs (see People v Sugden, 35 NY2d 453, 460), and the comparison of the DEA graphs with graphs produced by the infrared spectroscopic analysis of certified known samples, performed personally by the police expert during a trial recess (see People v Miller, 57 AD2d 668, at p 669, interpreting People v Sugden, 35 NY2d, at p 461, supra).
To establish the professional acceptability of the DEA graphs under the first Sugden standard, the People introduced evidence that the DEA manual in which the published graphs appeared was “respected literature in the field” used by “many, many forensic science laboratories”. Morever, the testimony as to the reliability of the “known” samples used to test the results of “crystal” and “thin-layer chromatography” analysis indicated that the testing of the certified “knowns” involved comparison of graphs made by infrared spectrography of the “knowns” against graphs published in the same DEA manual, providing the basis for an inference that the DEA manual was a reliable standard of comparison.
The court finds this evidence of professional acceptability to be adequate foundation for expert opinion, despite the fact that the source of testimony as to the reliability of the published graphs was the police expert who relied upon them. The identity of the “acceptability” witness should not vitiate the reliability of the testimony, since the police chemist was qualified as an expert in the analysis of chemical substances and in the techniques by which such analyses were done, including the reliability of comparisons made in the course of analysis. Moreover, no evidence was introduced to contradict the testimony of the police expert as to the reliability of the procedure or of the
*761 standard graphs; hence there is nothing in the record to cause any reasonable doubt as to the professional acceptability of the tests employed or the standards used by the People’s witness. (See People v Prince Jagendorf Greene, 7 NY2d 42, supra.)
Moreover, the People bolstered the foundation for their expert’s opinion by attempting to establish — under the second Sugden exception to the hearsay rule, as interpreted in Miller (supra) — the police chemist’s personal knowledge as to the accuracy and reliability of the DEA graphs. Thus the People introduced evidence that the chemist had performed infrared spectroscopy tests on certified known samples used as standards in “crystal” and “thin-layer chromatography” tests, producing graphs which he compared with the DEA graphs to establish a positive correlation between known sample and DEA material. The chemist’s testimony as to such personal analysis was subject to cross-examination, as required under the second Sugden exception to the hearsay limitations on expert opinion (see 35 NY2d, at p 461, supra); it certainly provided evidence “that the known substance [the expert] relied upon for his comparative tests was tested by him,” such that “the local chemists” could be said to have “tested the Federal standard and concluded that it was [the substance in question]” providing an adequate foundation for the chemist’s opinion under People v Miller (57 AD2d, at pp 668-669, supra).
Indeed, the defendant’s cases, particularly Miller (supra) and People v Branton (67 AD2d 664) ultimately provide support for the People’s argument that the prosecutor established an adequate foundation for the police chemist’s opinion, by delineating the particular deficiencies of the prosecutor’s proofs and by suggesting how such deficiencies could have been remedied. Thus, in Miller, the Third Department emphasized the People’s failure to introduce evidence that the DEA “known” was either personally tested by the People’s expert or otherwise established as a reliable basis for professional opinion, implying that even if the sample was not admissible as certified public record under CPLR 4540, appropriate testimony as to its reliability would have saved the expert’s opinion testimony. Simi *762 larly, in Branton, the Second Department indicated that the deficiencies in the People’s foundation involved the absence of proof as to the provenance of the uncertified “known” samples and the failure to make any independent analysis of the samples — deficiencies which could be remedied not by certification but by appropriate testimony on the part of the People’s experts. In contrast to the deficiencies in Miller and Branton, in the instant case, while there was also no certification of the published standard against which the known was tested, there was ample testimony as to the professional acceptability of the use of DEA graphs for purposes of comparison; moreover, the police chemist himself ran infrared spectrographic tests of certified “known” samples, producing graphs which he compared against those in the DEA manual. Hence the expert testimony as to the infrared spectroscopic analysis of the substances allegedly sold by defendant fits squarely into either or both grounds upon which the Court of Appeals, in Sugden (supra), indicated that expert testimony might be based on hearsay material not in evidence: there was proof that the data — the standard graphs provided in the DEA manual — was “of a kind accepted in the profession as reliable in forming a professional opinion;” there was also proof that the data had been tested by a witness subject to full cross-examination.
Motion denied.