OPINION OF THE COURT
Richard D. Carruthers, J.
Herbert Weinstein stands indicted for the crime of murder in the second degree. The indictment alleges that Weinstein murdered his wife, Barbara, on January 7, 1991. Weinstein allegedly strangled his wife in their 12th floor apartment in Manhattan, and then threw her body from a window to make her death appear to be a suicide.
Weinstein’s attorney has filed notice that the defense at trial will be that Weinstein lacked criminal responsibility for killing his wife due to mental disease or defect. (See, CPL 250.10; Penal Law § 40.15.) Evidence to support this defense includes scans of Weinstein’s brain obtained through positron emission tomography (PET) and the results of skin conductance response (SCR) tests of his autonomic nervous system. The PET scans were obtained after Weinstein’s indictment. The purpose of the scans was to enable neurologists and psychiatrists to study images that depict how Weinstein’s brain functions metabolically in its various regions. In accordance with the applicable protocol, a radioactive substance called flourine-18 deoxyglucose was injected into Weinstein’s body several minutes before each scan was made. In each instance, when this substance reached Weinstein’s brain, it was metabolized, to a point, in the same way that glucose is metabolized. The human brain uses glucose as its energy source. The radioactivity that then was emitted from Weinstein’s brain during the metabolic process was captured by a highly sophisticated monitoring device. The device, in each scan, converted this radioactivity into images that showed how well or ill each region of Weinstein’s brain was performing metabolically. Weinstein’s PET scans confirmed that a cyst exists within the arachnoid membrane, one of the brain’s protective coverings. This arachnoid cyst is an abnormality that was first detected by images of brain structure obtained by an MRI machine. The PET scans also showed metabolic imbalances exist in areas of the brain near the cyst and opposite it.
The SCR test of Weinstein’s autonomic system were per *36 formed, also after indictment, at the neurological laboratory of the University of Iowa. The physicians at this laboratory are the first to use SCR tests of the autonomic nervous system as a means of indicating the existence of lesions in the frontal lobes of the brain. During the tests, a machine similar to a polygraph is used to measure a person’s galvanic skin responses while that person is shown a series of photographs depicting scenes ranging in emotional content from the serene to the shocking. Unlike more familiar polygraph tests, SCR tests are not used as a purported means of determining whether a person is telling the truth. Weinstein’s SCR results were consistent with those of tested individuals who were confirmed as having lesions in the frontal lobes of their brains.
PET scans and SCR test results, according to Weinstein’s attorney, are factors that a psychiatrist will rely upon at trial to explain his diagnosis that, due to mental disease or defect, Weinstein was not criminally responsible for the death of his wife. The psychiatrist will explain that his diagnosis is also based upon physical and neuropsychological tests, his interviews of Weinstein, as well as other information available to him. The District Attorney has moved for an order precluding Weinstein’s attorney from offering at trial any testimony or other evidence concerning the PET scans and SCR test results, arguing that PET and SCR technology have not been shown to be sufficiently reliable as diagnostic devices for brain abnormalities so as to warrant the admission of such evidence at the trial of a criminal case. Pursuant to this court’s order, a pretrial hearing was held upon this motion. Many physicians, including neurologists, psychiatrists, and experts in nuclear medicine, testified at this hearing. The court resolves below the issues raised by the District Attorney’s motion.
I.
Almost 70 years ago James Alphonso Frye was tried for murder in Washington, D.C. During the trial his attorney offered as corroboration for Frye’s exculpatory statements the results of a "systolic blood pressure deception test” performed on Frye prior to trial. The trial court refused to admit the test results. Frye was convicted. On appeal, Frye’s principal argument was that the trial court erroneously excluded relevant evidence of a scientific nature. The Circuit Court of Appeals affirmed Frye’s conviction. It held that the trial court’s exclusion of the test results was correct, finding that the systolic *37 blood pressure deception test had not gained "general acceptance” among authorities in the fields of physiology and psychology. (Frye v United States, 293 F 1013, 1014 [DC Cir 1923].) The court stated its full holding as follows: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.” (Supra, at 1014.)
The "general acceptance” test of Frye (supra) for the admission of scientific evidence at trial is the standard most often used by courts throughout the United States. (Gianelli, The Admissibility of Novel Scientific Evidence: Frye v United States, a Half-Century Later, 80 Colum L Rev 1197, 1200 [1980].) Those who support continued reliance upon the Frye test argue: it guarantees that in any particular case independent experts will exist who can be called upon to carefully examine a scientific opinion; that it promotes uniformity of judicial decisions with respect to the admission of scientific evidence; and that it protects juries from being misled by expert opinions that may be couched in formidable scientific terminology but that are based on fanciful theories. (See, Note, The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Criminal Defendant, 42 Stan L Rev 465, 497 [1990].)
The Frye test is not without detractors. (See, e.g., People v Mooney, 76 NY2d 827, 828 [1990] [Kaye, J., dissenting].) Its critics most frequently argue: that the identification of the appropriate discipline or professional field can be problematical, because many scientific techniques cut across several disciplines; that the percentage of experts in a field who must accept the technique before it can be accorded the status of "general acceptance” is unclear; and that the delay between the introduction of a scientific technique and its recognition as generally accepted prevents reliable evidence from being heard in court. (Giannelli, op. cit., at 1208-1211, 1223-1224.) Perhaps the potential for undue restrictiveness under the Frye test occasions the sharpest criticism. As one court recently noted: "[T]he [Frye rule] has not escaped significant criticism or downright rejection. It has been attacked for its overly *38 conservative approach to admissibility and its susceptibility to manipulation in order to exclude novel scientific evidence.” (United States v Jakobetz, 955 F2d 786, 794 [2d Cir 1992].)
The courts of New York, including the Court of Appeals, regularly apply the Frye test in cases involving novel scientific evidence. They have done so where such evidence concerned physical phenomena and measurements.[1] They have also employed the Frye test where psychological or physiological theories were offered as a novel means of explaining human behavior.[2] The case law thus demonstrates the existence of a judicial policy in this State to favor the Frye test due to its strengths and despite its potential for undue restrictiveness.
The judicial policy in New York favoring the Frye test might seem to require its application to all issues regarding the admissibility of the novel scientific evidence that Weinstein wishes to offer at his trial, PET and SCR. However, *39 application of the Frye test is complicated by the fact that Weinstein’s defense at trial will be the affirmative defense that he was not responsible for his conduct due to mental disease or defect. The PET and SCR evidence is to be offered in partial support of Weinstein’s psychiatrist’s opinion that his cognitive ability was so impaired that when he allegedly killed his wife he lacked substantial capacity to know or appreciate either the nature and consequences of his conduct or that his conduct was wrong.[3] (See, Penal Law § 40.15.)
When a defendant in a criminal case interposes the insanity defense, he may offer at trial the testimony of psychiatric experts to support it. Should Weinstein present such evidence, as his counsel says he shall, the People must be accorded an opportunity to present their own psychiatric experts in rebuttal. (See, Matter of Lee v County Ct., 27 NY2d 432 [1971]; People v Segal, 54 NY2d 58, 64 [1981].) The permissible scope of the testimony of psychiatric experts on the subject of diagnostic opinion in an insanity defense case is set out in CPL 60.55 (1). It is this court’s view that the statute, which applies only to insanity defense cases, requires the admission of evidence directly relating to the diagnosis of mental disease or defect that might otherwise be properly excluded under the Frye test. The first paragraph of section 60.55 (1) provides that a psychiatrist or licensed psychologist who testifies in such a case must be permitted to state the nature of any examinations performed upon the defendant, the diagnosis reached, and the extent, if any, to which the defendant’s ability to understand the nature, consequences, and wrongfulness of his conduct was impaired by mental disease or defect. The second paragraph of section 60.55 (1) directly bears upon the issue of whether the results of PET and SCR should be admitted at trial. This paragraph specifically states what a psychiatrist or licensed psychologist "must be permitted” to offer by way of explanation for the diagnosis reached: "The psychiatrist or licensed psychologist must be permitted to make any explanation reasonably serving to clarify his diagnosis and opinion, and may be cross-examined as to any matter bearing on his competency or credibility or the validity of his diagnosis or opinion.” (CPL 60.55 [1].)
*40 Under the plain wording of this provision, a court "must” permit a psychiatrist or licensed psychologist in an insanity defense case to give "any” explanation for the diagnosis so long as it reasonably serves to clarify the diagnosis. There apparently is no reported case in New York dealing directly with the application of section 60.55 (1) to questions concerning the admissibility of novel scientific evidence in an insanity defense case. In a different context, however, the Court of Appeals did indicate that when the insanity defense has been interposed, latitude should be accorded to psychiatric experts in explaining their diagnostic opinions. As the Court stated in 1971 in Lee (supra): "To prevent the psychiatrist from giving the basis of his opinion would vastly limit the value of psychiatric examinations * * * We note that the importance of adequate psychiatric opinions has been emphasized in section 60.55 of the new Criminal Procedure Law.” (27 NY2d, at 441.)
The wording of the second paragraph of section 60.55 (1) is virtually identical to a provision of the Model Penal Code, one of the sources from which the Penal Law is derived. Section 4.07 (4) of the Model Penal Code states, in pertinent part, that a psychiatrist or other expert who testifies in an insanity defense case "shall be permitted to make any explanation reasonably serving to clarify his diagnosis and opinion and may be cross-examined as to any matter bearing on his competency or credibility or the validity of his diagnosis or opinion.” It is instructive that the intent of the drafters of this model statute was to foster a full airing of reasonable psychiatric opinions in insanity defense cases. As the Explanatory Note to this provision states, section 4.07 (4) was designed to free psychiatric experts from those evidentiary restrictions that would otherwise inhibit or prevent them from thoroughly explaining to a jury what they know of a defendant’s mental condition: "Subsection (4), which indicates the sort of testimony experts may give, is meant to eliminate artificial constraints on psychiatric testimony by allowing the experts to testify fully in terms comprehensible to the jury about their conclusions and the basis for those conclusions” (emphasis added).
The Comment to the Model Penal Code provision elaborates upon the Explanatory Note’s theme that the design of section 4.07 (4) is to remove those "artificial constraints” that inhibit psychiatric experts from testifying "fully” about their diagnoses in insanity defense cases. According to the Comment, *41 the Model Penal Code provision goes "considerably further” than prior legislation to ensure that such an expert will have an adequate opportunity to testify about the diagnosis and the reasons for it: "Subsection (4) [of section 4.07 of the Model Penal Code] is intended to meet the valid procedural objection of psychiatric experts to limitations often imposed upon their testimony. It goes considerably further than prior legislation in assuring that a psychiatric expert who has examined the defendant will have an adequate opportunity to state and explain his diagnosis of the defendant’s mental condition at the time of the conduct charged, and his opinion as to the extent of the impairment of the defendant’s capacity at that time. The expert is not restricted to the latter testimony alone and is not required to state his opinion in hypothetical form.” It is thus clear that both section 4.07 (4) of the Model Penal Code and New York’s CPL 60.55 (1) are aimed at permitting psychiatric experts to testify concerning information that reasonably serves to clarify and support the diagnosis. Indeed, the touchstone of both provisions is reasonableness.
To arrive at a valid diagnostic opinion, a psychiatric expert is entitled under the norms of the profession to consider such sources of background information as the statements of the defendant and witnesses, police reports, hospital records, and results of all relevant neuropsychological and medical tests performed upon the defendant. (Dieden and Gasparich, Psychiatric Evidence and Full Disclosure In the Criminal Trial, 52 Cal L Rev 543, 547 [1964].) It is hardly surprising, then, that in forming a diagnosis psychiatrists and psychologists do consider technical and scientific material that, while relevant and reasonable, has not been accorded general acceptance in their disciplines. In fact, during the hearing in the case at bar, Doctor Norman Relkin, one of the defendant’s experts, observed that "there are hundreds and thousands of tests that we use which wouldn’t meet that criteria [of general acceptance], that a physician uses in making his diagnosis.” Doctor Daniel Martell, the forensic psychologist called by the People, alluded to this very point when he testified that the clinical judgment of a diagnostician is, in part, "based on the clinician’s accumulated experience over the years that he or she has been in practice, and every clinician learns from that process.” Thus, a requirement that each diagnostic test administered to a defendant in an insanity defense case pass muster under the Frye test might well impair, in contravention of section 60.55 (1), the ability of a psychiatric expert "to make *42 any explanation reasonably serving to clarify his diagnosis and opinion.”
Having stated that the Frye test is inapplicable under section 60.55 (1) to evidence relating to the diagnostic tests employed by psychiatric experts in insanity cases, this court must now state that it would be a mistake to conclude that the statute’s test of reasonableness completely supercedes the Frye test in these cases. It does not. Section 60.55 (1) loosens only the restrictions that might otherwise be placed upon a psychiatric expert’s ability at trial to provide a reasonable explanation for the diagnosis and opinion about the defendant’s mental state. The statute does not by its terms affect such matters as the standard that must be met to justify a psychiatric expert’s testimony that a mental disease or syndrome does in fact exist or that a psychological or physiological theory serves to explain human behavior.
Unlike the diagnosis of a patient, which, in large measure, is based upon the clinical judgment of a psychiatrist or psychologist that is formed by information particular to that patient, such issues as whether a mental disease or syndrome exists or whether a theory validly explains conduct are matters susceptible to controlled research studies, to debate by a cross-section of experts in the field, and, if warranted, to general acceptance. Thus, courts in New York readily have applied the Frye test in determining the latter, overarching issues.[4] In People v Taylor (75 NY2d 277, supra [1990]), for example, the Court of Appeals used the Frye test to determine whether there existed a rape trauma syndrome that encompassed identifiable patterns of posttraumatic behavior on the part of affected rape victims.[5] Upon the record before it, the Court declared that it was satisfied "that the relevant scientific community has generally accepted that rape is a highly traumatic event that will in many women trigger the onset of certain identifiable symptoms (see, Frye v United States, 293 F 1013; People v Hughes, 59 NY2d 523, 537).” (75 NY2d, at 286.)
To recapitulate: in an insanity defense case, the existence of a mental disease or syndrome or the validity of a theory of human behavior must be generally accepted in the field of *43 psychiatry or psychology before experts may discuss such matters in their testimony at trial. If general acceptance has been attained, a psychiatric expert then "must be permitted” to state a diagnosis and to give a reasonable explanation for a finding that the defendant does or does not suffer from the mental disease, or that that person is or is not affected by the syndrome, or that a theory of human behavior does or does not explain the defendant’s conduct.
II.
The evidence adduced at the hearing showed that Weinstein’s brain is abnormal due to the presence of the arachnoid cyst, the attendant displacement of the left frontal lobe, and firm indications of metabolic imbalance near the cyst and the regions of the brain opposite it. The defendant’s experts testified at length about these matters. Doctor Jonathan Bro-die, the People’s expert, also acknowledged in his testimony that Weinstein’s brain is abnormal, "[b]ecause there is evidence of a cyst in the brain from the MRI results. Once you have a sack in the skull, it’s going to compress the brain and make it look abnormal.” Doctor Brodie testified, too, that Weinstein’s brain exhibited "an abnormality in his regional glucose metabolism.”
The frontal lobes of the human brain — the general region where Weinstein’s abnormalities are most apparent — control the so-called executive functions. The ability to reason and to plan constitute the most important of these functions. The frontal lobes, in other words, are the seat of man’s cognitive powers. According to the evidence at the hearing, damage to the frontal lobes can adversely affect a person’s reasoning capabilities. Putting it another way, as did Doctor Daniel Martell, the People’s forensic psychologist, "cognitive impairment is a sign of frontal lobe dysfunction.” Thus, according to Doctor Martell, damage to the frontal lobes may be signaled by an erosion of a person’s powers of judgment, insight, and foresight. These are matters that are generally accepted as valid in the fields of psychiatry, psychology, and neurology.
Defense counsel intends to call at trial a psychiatrist to testify that the moment Weinstein allegedly killed his wife, he lacked the cognitive ability to understand the nature and consequences of his conduct or that his conduct was wrong. The psychiatrist is prepared to testify that Weinstein’s cognitive power was impaired at that instant, in part, by organic *44 brain damage. Defense counsel states that this opinion is to be based upon many sources of information, including PET and SCR test results. As noted above, the admissibility of the results of these tests depends upon whether it would be reasonable for the psychiatrist to consider these results with other available information in forming a diagnosis that Weinstein’s cognitive ability was so impaired at the time he allegedly killed his wife that he was not responsible for his conduct.
PET is a highly advanced form of medical technology. Doctor Abass Alavi, a pioneer in the development and uses of PET, testified that PET has been employed as both a research tool and a diagnostic device for several years. PET’s use for purposes of obtaining images depicting the metabolic functioning of various organs, including the brain, has been the subject of review articles in major medical publications. As one of these articles categorically states, "[pjositron emission tomography (PET) scanning with fluorine-18 deoxyglucose (FDG) is now generally accepted as a method for measuring glucose metabolism in the brain.” (Brooks, Test-Retest Studies of Cerebral Glucose Metabolism Using Fluorine-18 Deoxyglucose: Validation of Method, 28 J Nuclear Med 53 [1987].) This statement was confirmed at the hearing by all the PET experts who testified, including Doctor Brodie, the People’s witness. As discussed earlier in this opinion, general acceptance of a diagnostic device or technique — the Frye test’s requirement for admissibility — is a more stringent standard than the test or reasonableness that is applicable, by virtue of CPL 60.55 (1), to insanity defense cases in New York. Thus, a diagnostician’s consideration of Weinstein’s PET test results, insofar as they depict the existence of both the cyst and the metabolic imbalances in Weinstein’s brain, is, a fortiori, reasonable. The District Attorney argues that the complex mathematical formulae used to quantify the results of PET tests have not gained general acceptance in relevant technological and medical fields. Doctor Alvai’s testimony supports this argument. However, the evidence shows that the formulae are used with regularity by PET experts and that the results are relied upon by them. Consequently, in forming a diagnosis, a psychiatrist in an insanity defense case could reasonably consider the quantitative results derived by application of the formulae to raw data.
According to Doctor Norman Relkin, SCR tests are routinely used to diagnose dysfunction of the autonomic nervous *45 system. They have not been widely used as a means of diagnosing damage to the frontal lobes of the brain. The latter point does not mean, however, that a psychiatrist would be acting unreasonably in including the results of such tests in the data base used to make such a diagnosis. Although SCR tests do not directly evince frontal lobe dysfunction, experiments performed on 50 subjects at the neurological laboratory at the University of Iowa indicate that SCR tests can be used successfully to distinguish patients with abnormalities in the frontal lobes from normals and from patients with damage in other areas of the brain. The results of these experiments were reported in a medical journal by the chief of the Iowa laboratory, Doctor Antonio Damasio, a neurologist who, according to Doctor Relkin, is highly regarded in the profession. (See, Damasio, Individuals with Sociopathic Behavior Caused by Frontal Damage Fail to Respond Autonomically to Social Stimuli, 41 Behavioural Brain Res 81 [1990].)
It would seem unreasonable for a psychiatrist to rely exclusively on SCR tests as a basis for concluding that a particular patient suffered from frontal lobe damage. The Damasio report does not merit such complete reliance, given the fact that the number of persons tested was relatively small. However, because Doctor Damasio’s reputation as a scientist is good, because the experiments were performed according to a carefully devised protocol, and because the results were peer reviewed prior to their publication, a psychiatrist would be reasonable in considering the results of the SCR tests as a form of corroboration of other, more definitive tests, namely PET and MRI, that clearly show abnormalities in Weinstein’s left frontal lobe.
III.
PET and SCR test results in this case pass the test of admissibility as set down in CPL 60.55 (1). However, mention should be made here of the rules of People v Stone (35 NY2d 69 [1974]) and People v Sugden (35 NY2d 453 [1974]). These cases deal with hearsay problems that may arise during the testimony of psychiatric experts in insanity defense cases. Realizing that an overly strict application of the rule prohibiting hearsay was unworkable with respect to the testimony of the psychiatric experts in such cases, the Court of Appeals carved out the exceptions to the prohibition. The Court summarized these exceptions in Sugden as follows: "The psychia *46 trist may rely on material, albeit of out-of-court origin, if it is of a kind accepted in the profession as reliable in forming a professional opinion * * * He may also rely on material, which if it does not qualify under the professional test, comes from a witness subject to full cross-examination on the trial.” (35 NY2d, at 460-461.)
Under the first Stone-Sugden exception, it would not be a hearsay violation for a psychiatrist to testify, without any foundation testimony, that Weinstein’s PET tests indicate the presence of the arachnoid cyst and metabolic imbalances. This follows from the fact that PET, as noted previously, has gained general acceptance as a means of imaging regional brain function. However, the formulae used to quantify the raw data obtained from the PET scans is not generally accepted. (See, supra, at 41-42.) Evidence of a scientific nature that is not admissible under the first Stone-Sugden hearsay exception may be admitted nonetheless if there is compliance with the prerequisite of the second exception, i.e., the foundation testimony of a witness with direct knowledge. (See, People v Miller, 57 AD2d 668, 669 [3d Dept 1977]; see also, People v De Zimm, 112 Misc 2d 753, 761 [Tompkins County Ct 1981].) Therefore, Weinstein’s psychiatrist would be permitted to testify concerning the quantitative results and to include them in explaining a diagnostic opinion once there is compliance with this prerequisite. Because SCR tests are not generally accepted as tests for frontal lobe damage, the examining psychiatrist may refer to them only after this second Stone-Sugden hearsay exception is met as to them as well.
IV.
Having discussed what is admissible evidence, brief reference should be made to certain theories relating to human behavior that may not be mentioned in testimony at the trial. Evidence concerning these theories is not admissible because they have not been generally accepted as valid in the fields of psychiatry, psychology, and neurology. (See, supra, at 41-42.) The first of these theories is that arachnoid cysts directly cause violence. Doctor Martell testified categorically that this theory was not generally accepted, noting that he had seen no scientific research to support it. Doctor Relkin, the defendant’s witness, appeared to agree. Another theory that has not been generally accepted is that reduced levels of glucose metabolism in the frontal lobes of the brain directly cause violence. *47 In his brief, the defendant disavows any intention to rely on this theory at trial. As he states, "[w]ith respect to hypometabolism causing violence, it is critical for the Court to recognize that it is a completely false issue.” This position is fully justified by the record. The only evidence offered in support of the theory was a preliminary research report: Volkow and Tancredi, Neural Substrates of Violent Behaviour, a Preliminary Study with Positron Emission Tomography (151 Brit J Psychiatry 668 [1987]). The report concerned four patients, each of whom had a history of purposeless violent behavior. PET scans showed hypometabolism in the frontal lobes. However, each of the four patients also had long-standing personality disorders apparently resulting from such problems as alcoholism and drug abuse. It cannot be definitively stated that the behavioral problems of these four patients was due to hypometabolism and not to their personality disorders, a fact that the authors of the report fully recognized. (Volkow and Tancredi, op. cit., at 670-671.) Doctor Brodie, the People’s witness, trained the report’s principal author, Doctor Nora Volkow, in PET scanning. He testified that her report was published because the four cases were "potentially of interest,” and that the findings were "potentially to be further investigated.” Thus, a conclusion based upon Volkow and Tancredi’s report that hypometabolism in the frontal lobes causes violence would be entirely premature and not at the level of general acceptance in the relevant scientific disciplines.
A third theory mentioned at the hearing that has not gained general acceptance in the fields of psychiatry, psychology, and neurology is the somatic marker theory. The theory has relevance to SCR testing. According to Doctor Relkin, this theory was devised by Doctor Damasio as an attempt to explain aberrant behavior in light of SCR findings of autonomic abnormalities.[6] Doctor Relkin explained the somatic marker theory as follows:
"Somatic markers refers to the concept that an autonomic response is a kind of gut reaction, literally a gut reaction to an event in the world.
"When an individual is behaving in a social milieu in which *48 there are many, many complex things happening at once, it would be difficult if not impossible for them to consciously deal with each of those things in turn. * * *
"Damasio in the somatic marker theory is suggesting that [a person’s] history of reward and punishment gets encoded into bodily responses. * * *
"So, [Damasio’s] theory is in effect an acknowledgment of the fact that cognition requires a lot of unconscious processes of the type that aren’t easily amenable to neuropsychological testing, and tests such as this [i.e., SCR] help us to find patients who have abnormalities in that system.”
While cognitive problems might render a person unable to choose a proper behavioral response in a moment of stress, it has not been shown that experts in the relevant disciplines generally accept the theory that aberrant behavior can be the product of a person’s history of reward and punishment responses as encoded in the autonomic nervous system. Rather, Doctor Damasio appears to have first proposed this theory in his research report as a "possible” explanation of the phenomena that his team observed during reported SCR studies. (Damasio, op. cit., at 81, 90.)
The foregoing constitutes the court’s decision on the evidentiary issues raised by the District Attorney’s motion. The parties are ordered to comply with the rulings expressed within this decision should PET and SCR test results be offered in evidence at trial.

. See, e.g., People v Leone (25 NY2d 511, 517 [1969] [the results of a lie detector test were found inadmissible because such evidence "failed to meet the standard set by this court 'to show a general scientific recognition that the [polygraph] possesses efficacy’ ”]); People v Middleton (54 NY2d 42, 49 [1981] [bite mark evidence as a means of identification was held admissible, the Court noting that the test of admissibility was "not whether a particular procedure is unanimously indorsed by the scientific community, but whether it is generally accepted as reliable”]); People v Castro (144 Misc 2d 956, 979 [Sup Ct, Bronx County 1989] [the results of DNA forensic identification tests were declared admissible because the theory underlying the tests and the means used to garner and interpret the data passed the test of "general scientific acceptance” and the "Frye standard of admissibility”]).

. See, e.g., People v Taylor (75 NY2d 277, 286 [1990] [evidence of the existence of rape trauma syndrome was held admissible where the prosecutor offered it for the limited purpose of explaining a rape victim’s conduct after the crime, including her failure to identify the assailant immediately after the crime because "the relevant scientific community has generally accepted that rape is a highly traumatic event that will in many women trigger the onset of certain identifiable symptoms”]); People v Torres (128 Misc 2d 129, 135 [Sup Ct, Bronx County 1985] [evidence of battered woman syndrome was admitted in support of defendant’s defense of justification, the court finding "that the theory underlying the battered woman’s syndrome has indeed passed beyond the experimental stage and gained a substantial enough scientific acceptance to warrant admissibility”]); People v Yukl (83 Misc 2d 364, 371 [Sup Ct, NY County 1975] [the trial court denied an indigent defendant’s application for appointment of a cytogeneticist to test him for the XYY syndrome, because, applying the Frye test, the court found that the exact biological mechanism between genetic composition and deviant behavior "has yet to be determined”]); see also, People v Hughes (59 NY2d 523, 543 [1983] [testimony that was derived from recollection either refreshed or enhanced by hypnosis was held to be inadmissible because it is "evident” that hypnosis had not gained "general acceptance in the scientific community as a reliable means of restoring recollection”]).

. Weinstein’s psychiatrist’s opinion, according to the defendant, will also be based upon matters that were not the subject of the District Attorney’s motion to preclude, including CAT and MRI scans of his brain, neuropsychological tests, and psychiatric interviews of the defendant and others.

. See, n 2, at 38, supra.

. Taylor (supra) was not an insanity defense case. The Court explained in its opinion the circumstances under which prosecutors could elicit evidence about the rape trauma syndrome to explain the seemingly passive posttraumatic conduct of certain rape victims.

. The defendant has not indicated an intention to rely upon the somatic marker theory. His defense is that at the moment he allegedly killed his wife, his purported cognitive difficulties rendered him unable to choose a proper response to the stressful situation he faced when, according to his statement to the police, his wife scratched his face during an argument.