[632 NYS2d 839]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
STEPHANIE WERNICK, Appellant.

Second Department, October 23, 1995

## APPEARANCES OF COUNSEL

*Stephen P. Scaring,* Garden City *(Laurie S. Hershey* of counsel), for appellant.

*Denis Dillon, District Attorney* of Nassau County, Mineola *(Bruce E. Whitney* and *Margaret E. Mainusch* of counsel), for respondent.

## OPINION OF THE COURT

Pizzuto, J. P.

After giving birth to a baby boy in the bathroom of her college dormitory, the defendant asphyxiated the infant by stuffing toilet paper down his throat. She then placed him in a garbage bag and had an unwitting friend dispose of the bag.

At trial, the defendant raised an insanity defense, claiming that she lacked the substantial capacity to know and to appreciate the nature and consequences of her conduct or that such conduct was wrong.

The defendant presented expert testimony which established (1) that during her pregnancy she totally denied that she was pregnant, (2) that denial occurs in almost all cases in which women kill their children immediately after birth, and (3) that in a significant number of those cases the women really did not know that they were pregnant. Further, the defendant's experts concluded that, upon giving birth, the defendant suffered from a brief reactive psychosis because she could no longer deny the reality of her pregnancy. The defendant's experts also concluded that, during this psychotic state, the defendant was able to perform purposeful acts, such as stuffing toilet paper in the infant's mouth, but that she was unable to appreciate the nature and consequences of her conduct.

■ Although the trial court permitted the aforementioned testimony by the defendant's expert witnesses, it properly precluded those witnesses from also testifying that the defendant suffered from the so-called neonaticide syndrome.

Before an expert may testify about the existence of a mental disease or syndrome, the party seeking the introduction of such testimony must establish that the disease or syndrome is generally accepted in the field of psychiatry or psychology and that it would assist the jury in rendering a verdict (see, People v Taylor, 75 NY2d 277, 287-292; People v Weinstein, 156 Misc 2d 34, 42-43; see generally, Frye v United States, 293 F 1013). The general acceptance of novel scientific evidence such as a psychological syndrome may be established through texts and scholarly articles on the subject, expert testimony, or court opinions finding the evidence generally accepted in the relevant scientific community (see, People v Wesley, 83 NY2d 417, 437; People v Middleton, 54 NY2d 42, 49-50).

The defense in this case failed to establish that the neonaticide syndrome is generally accepted in the fields of psychiatry and psychology. At the outset of the trial, the People requested a hearing to determine the scientific reliability of the syndrome. However, defense counsel vigorously opposed the People's application by stating, "I don't know what syndrome [the prosecutor] is talking about." Defense counsel assured the

court and the prosecutor that the defendant's experts were "not going to say this is a syndrome." During the trial, however, defense counsel sought to establish that the defendant suffered from the neonaticide syndrome, and the court ruled that it would not permit the defendant's expert to create "a new syndrome that [has] not been tested by a [c]ourt at a hearing." Notwithstanding the clarity with which the court articulated the basis for its ruling, defense counsel never requested that a hearing be conducted to determine whether the neonaticide syndrome has been generally accepted in the relevant scientific community. Thus, we disagree with our dissenting colleague, who has concluded that the Supreme Court erred by failing to conduct a hearing. The defendant not only never requested a hearing but also affirmatively opposed one when the issue was raised by the People.

Due to the position maintained by the defendant at trial, the record is devoid of any expert testimony regarding the acceptance of the neonaticide syndrome in the relevant scientific community. The defendant does not contend that other courts have determined that the neonaticide syndrome is generally accepted in the fields of psychiatry and psychology, and the defendant's contention that the scholarly literature establishes general acceptance of the syndrome is unpreserved for appellate review since the defendant failed to raise this argument at trial (see, CPL 470.05 [2]; *People v Bynum,* 70 NY2d 858). Although the defense may have provided the prosecution with articles upon which the defendant's experts based their opinions, those articles were not made a part of the record on appeal, and there is no indication in the record that the trial court was provided with any scholarly literature on the subject of the neonaticide syndrome. Accordingly, in the absence of any evidence in the record that the neonaticide syndrome is generally accepted in the relevant scientific community, the trial court properly excluded reference to it at trial (cf., *People v Bennett,* 79 NY2d 464; *People v Weinstein,* 156 Misc 2d 34, *supra).*

■ Furthermore, the trial court's rulings limiting the defendant's experts from testifying about the neonaticide syndrome did not violate the Criminal Procedure Law. CPL 60.55 (1) provides that a psychiatrist or licensed psychologist "must be permitted to make any explanation reasonably serving to clarify his diagnosis and opinion." Contrary to the viewpoint espoused by our dissenting colleague, the trial court did not prevent "the defendant's experts from alluding in any fashion

either to the literature or to their own experiences with neonaticide." Indeed, in ruling that the defendant's expert could not create "a new syndrome that [has] not been tested by a [c]ourt at a hearing," the court specifically stated as follows:

"I am not preventing the witness from testifying as to the basis of his opinions. I am just preventing him, as I said, from setting up a specific profile that he has gleaned from the literature, as to why young mothers, or mothers kill their babies. This common theme. * * *

"Certainly, the Doctor can testify as to this specific defendant, and what led him to his conclusions, based upon his own experiences, his reading of the literature, his studies of her, without quoting this common theme from the literature."

In sum, a review of the evidence adduced at trial and the language of the court's rulings on this topic lead us to the conclusion that the defendant's experts were not precluded from referring to the relevant literature or to their relevant experiences in expressing opinions regarding the defendant's mental state before, during, and after the crime.

■ The trial court properly admitted into evidence a photograph of the deceased infant. Photographs of victims may be admitted "to illustrate, elucidate or corroborate other evidence offered or to be offered at the trial" (People v Stevens, 76 NY2d 833, 835). The photograph in this case was admitted to illustrate the medical testimony. Thus, the trial court did not improvidently exercise its discretion in admitting the photograph into evidence (see, People v Ellwood, 205 AD2d 553).

We find that the circumstances of this case do not warrant modification of the defendant's sentence from a term of imprisonment to probation.

The defendant's remaining contentions, including the claims of prosecutorial misconduct, are either unpreserved for appellate review (see, CPL 470.05 [2]) or without merit.

FRIEDMANN, J. (dissenting). I respectfully dissent in the following opinion, and vote to reverse the defendant's conviction and to remit the matter to the County Court, Nassau County, for a Frye hearing and a new trial.

The defendant does not deny that she killed her baby immediately after it was born. However, she claims that when she did so she was suffering from a type of reactive psychosis following a pathological denial of her pregnancy. It was the

theory of the defense that the so-called neonaticide syndrome caused her to lack substantial capacity to know and to appreciate the nature and consequences of her conduct or that such conduct was wrong (see, Penal Law § 40.15).

Prior to trial, the defense supplied the prosecution, and apparently the court, with some scientific articles and case studies representing the body of literature upon which the defendant's experts intended to rely in establishing the foregoing defense. At least two of the defendant's expert witnesses had treated women suffering from the neonaticide syndrome and one had published a scientific paper on the subject.

As the trial was about to begin, the prosecutor moved for a hearing pursuant to *Frye v United States* (293 F 1013) on the scientific reliability, or the degree of acceptance in the scientific community, of the psychiatric theory propounded by the defense. The defendant opposed the People's motion, *inter alia,* because she perceived it to be an effort by the People to gain an unfair advantage by conducting a pretrial examination of her expert witnesses. Also, defense counsel initially denied that the mental disease or defect about which the defense experts were prepared to testify was a syndrome, although he later changed his position. The court denied the prosecutor's motion for a *Frye* hearing, ruling that CPL 60.55 governed the testimony to be given by the defendant's experts. The court remarked, accurately paraphrasing the statute, that, once qualified as an expert, "a psychiatrist or licensed psychologist must be permitted to make any explanation reasonably serving to clarify his diagnosis and opinion, with, of course, certain rights of cross-examination." The court went on to say, "Secondly, where the expert relies on unadmitted data—which is what I think you're both talking about—there has to be a proper foundation. It's my understanding of the proper foundation, that the expert testified that he regularly relies on certain non-record matter of the kind involved in the litigated case. For example, case histories or literature. And after he states that he has considered that material, he should identify whether his professional judgments are based in whole or in part on this information. Thereafter, he must establish that other similar experts place reasonable and customary reliance on the kind of material upon which the expert relied."

It is unclear from the statutory history and the controlling case law whether or not CPL 60.55 was intended to dispense with *Frye* hearings in prosecutions in which the insanity

defense is raised *(see, e.g., People v Stone,* 35 NY2d 69; *People v Sugden,* 35 NY2d 453). In an excellent discussion of this question, Justice Richard D. Carruthers of the Supreme Court, New York County, concluded that, while CPL 60.55 was designed to loosen the restrictions that might otherwise be placed on a psychiatrist's ability to provide a reasonable explanation for a diagnosis or for his opinion about a defendant's mental state, it has not rendered the *Frye* test altogether superfluous. Rather, according to Justice Carruthers, a *Frye* hearing should be held as a threshold matter to determine the admissibility of testimony on issues such as whether the claimed mental disease or syndrome exists and whether the psychiatric theory advanced by the defendant's experts is generally accepted in the scientific community *(see, People v Weinstein,* 156 Misc 2d 34). Thus, on the basis of the *Frye* hearing in the *Weinstein* case, Justice Carruthers determined that the defendant, who was accused of murdering his wife, could *not* put before the jury his theories that arachnoid cysts and reduced levels of glucose metabolism in the frontal lobes of the brain cause violence and that aberrant behavior could be the product of a person's history of reward-and-punishment responses as encoded in the autonomic nervous system. Justice Carruthers ruled that these theories were inadmissible because they had not been generally accepted as valid in the fields of psychiatry, psychology, and neurology. However, Justice Carruthers *did* permit the defendant's experts to testify about the results of brain scans of the defendant's brain obtained through positron emission tomography (hereinafter PET) and skin conductance response (hereinafter SCR) tests of the defendant's autonomic nervous system. Although these scientific techniques had not yet gained general acceptance among physiologists and psychologists, Justice Carruthers found that it would not be unreasonable for a psychiatric expert, in arriving at a diagnosis, to consider the PET and SCR test results, which indicated metabolic imbalances, an arachnoid cyst, and abnormalities in the left frontal lobe of the defendant's brain.

Justice Carruthers' ruling is consistent with the traditional practice in the New York courts, where *Frye* hearings have customarily been held when novel psychological or physiological theories have been advanced to explain human behavior *(see, e.g., People v Taylor,* 75 NY2d 277, 286 [evidence of rape trauma syndrome admissible to explain the victim's controlled and subdued conduct after the crime because the syndrome

had achieved general acceptance in the relevant scientific community]; *People v Hughes,* 59 NY2d 523, 543, *appeal after remand* 134 AD2d 939, *affd* 72 NY2d 1035, *cert denied* 492 US 908 [hypnotically enhanced memory not admissible because hypnosis had not gained general acceptance in the scientific community as a reliable means of restoring recollection]; *People v Burton,* 153 Misc 2d 681, 688 [defense expert could not testify that acute grief syndrome caused defendant to falsely confess to stabbing his mother to death since the syndrome did not enjoy the "requisite standing (in the scientific community) to allow expert testimony on its consequences"]; *People v Torres,* 128 Misc 2d 129, 135 [the court ruled that the battered woman's syndrome had gained sufficient scientific acceptance to warrant admissibility in support of the defendant's defense of justification]; *People v Yukl,* 83 Misc 2d 364, 371 [defendant could not produce evidence that he suffered from the XYY syndrome because the exact biological mechanism, if any, between genetic composition and deviant behavior had yet to be determined]).

Similarly, the court in this case should have held a *Frye* hearing to determine whether the neonaticide syndrome is a mental disease that is generally recognized in the psychiatric community and, if so, whether it qualifies as a defense under New York law.

Although in my opinion the trial court erred by failing to hold a *Frye* hearing to make these threshold determinations, that error alone does not warrant reversal. The court's decision *not* to hold a *Frye* hearing was tantamount to conducting the inquiry and determining the issues in the defendant's favor, i.e., concluding that the neonaticide syndrome *is* a recognized psychopathology and *is* a valid defense to the charges in the indictment. Although the record does not permit a review of this conclusion, the People do not strenuously deny that such a syndrome has been documented. Indeed, one of the prosecution's witnesses, Dr. Siegel, conceded on cross-examination that there *are* women who, as part of a pathological disorder, deny their pregnancies, but it was his opinion that the defendant did not display the usual features of the disorder.

The real error in this case arose when the trial court did not adhere to its original ruling and, thus, effectively deprived the defendant of her right to present a coherent defense. That is, notwithstanding the court's ruling pursuant to CPL 60.55, which is quoted above, and despite the court's related rulings

that the defendant's experts could draw upon the psychiatric literature and their own experiences with comparable cases in the course of their testimony, the court, in effect, reversed itself. When the defendant's experts actually testified, it precluded all evidence regarding what it characterized as a psychiatric profile. In doing so, the court remarked that it would not permit the defendant to "create a new syndrome that [has] not been tested by a [c]ourt at a hearing." It then explained, "[W]e are not going into a syndrome, we are not going to set up a profile of women who kill their children, the same as we would not permit the [D]istrict [A]ttorney to set up a profile of a serial killer, and try to show that the defendant fits within it." The court also stated, "Just like this one is a profile of a serial killer, and then we go on to say whether this defendant fits in it; therefore, confusing the jury with what—when what we're trying to determine is whether she fits into a profile, or is mentally ill or not."

Clearly the court erred in both law and logic. There is no similarity whatever between a prosecutor's attempted use of statistical data to convince a jury of a defendant's guilt, on the one hand, and a defendant's demonstration that his behavior conforms to a constellation of symptoms that establishes a diagnosis (and a defense) of mental illness, on the other hand.

Pursuant to its ruling, the court permitted the defendant's experts to testify to individual elements of the neonaticide syndrome, but it did not allow them to explain the syndrome itself. That is, it prevented the defendant's experts from alluding in any fashion either to the literature or to their own experiences with neonaticide and so left the jury with the impression that the defendant's behavior was sui generis, or a unique phenomenon. Thus, the jury heard evidence that the defendant was an immature, insecure, young woman with a low intelligence quotient and a pathological fear of parental rejection, who so completely denied her pregnancy that, when the child was actually born, she was taken by surprise and killed it in the course of a brief reactive psychosis. The jurors were not told that the defendant's constellation of symptoms (e.g., denial of her pregnancy, a brief reactive psychosis, and amnesia) was characteristic of the neonaticide syndrome described in the psychiatric literature, or that, for example, her ostensibly purposeful behavior at the time of parturition has been diagnosed in others as symptomatic of a psychotic dissociation. On the other hand, the prosecution's experts were permitted to rebut the defendant's vitiated psychiatric defense

by testifying, among other things, that she had feigned amnesia so that she could avoid confronting her crime and that her purposeful behavior was probative of sanity and cold criminal intent.

The court's erroneous ruling cannot be considered harmless. It deprived the defendant of her fundamental right to present a defense, and it is clear that, had the defense been fully developed, the defendant might have been acquitted. The jury, which ultimately convicted the defendant of a lesser included offense, sent several notes to the court during its deliberations, requesting readbacks and additional materials regarding neonaticide. While the readbacks were given, the court was obliged to advise the jurors that they could not have any data on the neonaticide syndrome because none had been admitted into evidence.

If we assume, as apparently the trial court initially did, that the defendant's defense is legally cognizable, I am forced to conclude from the record that she was deprived of her right to present it. Accordingly, I would reverse the judgment of conviction and remit the matter to the County Court, Nassau County, for a *Frye* hearing and for a new trial.

HART and FLORIO, JJ., concur with PIZZUTO, J. P.; FRIEDMANN, J., dissents in a separate opinion.

Ordered that the judgment is affirmed, and the matter is remitted to the County Court, Nassau County, for further proceedings pursuant to CPL 460.50 (5).