89 N.Y.2d 111 (1996)
674 N.E.2d 322
651 N.Y.S.2d 392
The People of the State of New York, Respondent,
v.
Stephanie Wernick, Appellant.
Court of Appeals of the State of New York.
Argued October 17, 1996
Decided November 21, 1996.
Stephen P. Scaring, P. C., Garden City (Stephen P. Scaring and Susan C. Carman of counsel), for appellant.
Denis Dillon, District Attorney of Nassau County, Mineola (Margaret E. Mainusch and Peter A. Weinstein of counsel), for respondent.
Chief Judge KAYE and Judges TITONE, SMITH, LEVINE and CIPARICK concur with Judge BELLACOSA; Judge SIMONS dissents and votes to reverse in a separate opinion.
*113 BELLACOSA, J.
Defendant appeals from an order of the Appellate Division, which affirmed a judgment of County Court, Nassau County, convicting her, after a jury trial, of criminally negligent homicide of her newborn infant. The dissenting Justice at the Appellate Division granted permission to appeal, and we now affirm.
The primary issue, as it has evolved, is whether CPL 60.55 (1) automatically obviates the need for a Frye hearing in this case. We must determine whether the trial court erred as a matter of law when it precluded, without a reliability assessment, reference by expert opinion witnesses to publications of others concerning profiles of a novel neonaticide "syndrome," proposed in support of the defendant's affirmative defense of insanity. Appellant also argues that the trial court deprived her of a fair trial by admitting a photograph of the deceased infant.
Upon giving unattended birth to a baby boy in the bathroom of a college dormitory, defendant asphyxiated the infant and secured a friend's unwitting assistance in disposing of the body. Defendant was charged with first and second degree manslaughter.
Before the trial commenced, the People requested that the trial court conduct a Frye hearing to determine the admissibility of the defense experts' expected testimony on neonaticide, a term used to describe a mother killing her newborn within 24 hours of birth. The People argued that defendant was required to establish the scientific reliability of neonaticide as a psychological syndrome if such evidence were to be accepted. Defense counsel specifically objected to a Frye hearing, stating that he had no intention of presenting neonaticide as a syndrome. County Court denied the People's request for a Frye hearing, stating that it would make specific evidentiary rulings regarding the expert's testimony as the trial progressed. The *114 court cautioned, however, that it would be unable to rule on syndrome evidence without a hearing.
On her affirmative defense of insanity, defendant presented expert testimony which tended to establish that (1) she completely denied the existence of her pregnancy, (2) such denial occurs in almost all cases in which women kill their newborn infants immediately after birth, and (3) in a large number of those cases the women believed that they were not pregnant. Defense experts also testified that, upon giving birth, defendant suffered from a brief reactive psychosis because she was no longer able to deny her pregnancy. The trial court permitted all this testimony but precluded defendant's expert witnesses only from additionally describing a profile of the symptoms of women who have killed their children under similar circumstances. Defendant objected to the limitation, arguing that CPL 60.55 (1) permits a psychiatric expert to testify as to the basis of an opinion in connection with an insanity claim and restricts courts from discretely evaluating the appropriateness of the basis of an expert's opinion.
The Appellate Division, with one Justice dissenting, affirmed defendant's conviction of criminally negligent homicide (215 AD2d 50). The Court reasoned that "[b]efore an expert may testify about the existence of a mental disease or syndrome, the party seeking the introduction of such testimony must establish that the disease or syndrome is generally accepted in the field of psychiatry or psychology and that it would assist the jury in rendering a verdict" (id., at 52, citing People v Taylor, 75 N.Y.2d 277, 287-292; People v Weinstein, 156 Misc 2d 34, 42-43; Frye v United States, 293 F 1013). The Court further held that the trial court's ruling did not violate CPL 60.55 (1) because the court did not preclude defendant's experts from referring to relevant literature or their own relevant experiences with other patients regarding neonaticide, but rather prohibited defendant's experts only from additionally setting up a specific psychiatric profile of women who kill their newborns (215 AD2d, at 53-54). Finally, it found no error with respect to the admission of the photograph. The dissenting Justice voted to reverse the defendant's conviction and to remit the matter for a Frye hearing and a new trial (id., at 54).
Defendant argues for reversible error and a new trial because of the trial court's refusal to allow her psychiatric experts to explain their reliance upon out-of-court scientific evidence. Specifically, she contends that defense experts had no intention of testifying that she was suffering from neonaticide *115 syndrome, as such and in that precise terminology. Such testimony, she concedes, would be inadmissible because the neonaticide syndrome has not been classified as an illness. To the contrary, defendant's lawyer argues, the defense experts sought to utilize the clinical experience of various doctors to support their expert opinions that defendant suffered from a brief reactive psychosis; that their proffered testimony was introduced to explain a diagnosis and not to establish a fact. Defendant asserts that she merely attempted to show that clinical studies have established patterns of conduct of young women, reflecting certain similar characteristics, who have suffered from a genuine pathological denial of their pregnancies and subsequently killed their newborns immediately after birth.
Defendant's contentions are not persuasive in the factual and procedural construct of this case. Regardless of whether defense counsel classified its proffered evidence as an attempt to establish a "pattern," "profile," "theory" or "syndrome," and regardless of whether defendant used the term "neonaticide syndrome," the essential defense theory was an attempt to portray a pattern of behavior not generally recognized in the relevant medical context and community. No threshold evidentiary foundation whatsoever was offered that acknowledged the validity or existence of defense counsel's postulate to warrant these experts using this kind of extrapolated material to bolster their expert opinions. Yet, defendant's theory  at best, a novel hypothesis and the product of a refined strategy  was presented for the jury's consideration by way of the experts' opinions. The only point of contention is the exclusion of additional improper bolstering based on outside influences and references that we agree should be subject to a reliability hearing under such circumstances as are proffered in this case. The strategic avoidance by the defense of this very procedural safeguard is not without its own significance in this regard.
This Court has often endorsed and applied the well-recognized rule of Frye v United States (293 F 1013, supra; but see, Daubert v Merrell Dow Pharms., 509 US 579; Fed Rules Evid, rule 702). That protocol requires that expert testimony be based on a scientific principle or procedure which has been "`sufficiently established to have gained general acceptance in the particular field in which it belongs'" (People v Wesley, 83 N.Y.2d 417, 423, quoting Frye v United States, supra, at 1014). Specifically, in People v Wesley, we noted that novel scientific evidence, such as DNA evidence, requires a determination as *116 to its reliability (People v Wesley, supra, at 422). In People v Taylor (75 N.Y.2d 277, supra), we concluded "that the relevant scientific community has generally accepted that rape is a highly traumatic event that will in many women trigger the onset of certain identifiable symptoms" (id., at 286). We, thus, held expert testimony describing rape trauma syndrome admissible when "offered to explain behavior that might appear unusual to a lay juror not ordinarily familiar with the patterns of response exhibited by rape victims" (id., at 293 [emphasis added]).
The Legislature has, to be sure, expressed a threshold of admissibility for when defendants assert the affirmative defense of insanity. CPL 60.55 (1) provides that a psychiatrist or licensed psychologist, testifying to a defendant's mental condition at the time of an offense charged, "must be permitted to make any explanation reasonably serving to clarify his [or her] diagnosis and opinion." This section was enacted to modify the common-law rule  otherwise known as the Keough rule (People v Keough, 276 N.Y. 141, 145)  that limited the expression of expert foundation testimony to facts in evidence and personal observation and examination of the defendant (Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 60.55 [1], at 147).
This Court has analyzed the effects of CPL 60.55 on this common-law restriction, specifically discussing the legislative purposes behind its enactment, which our ruling in no way undermines as the dissent contends. In People v Stone (35 N.Y.2d 69), we considered the issue of whether a psychiatric expert may testify as to reliance on out-of-court evidence  extrajudicial statements  despite the traditional common-law limitation (id., at 74, citing People v Keough, 276 N.Y. 141, supra). The Court stated that CPL 60.55 "represents an effort by the Legislature to strike a balance between the potentially conflicting factors [of] * * * the medical soundness and legal admissibility of a psychiatrist's expert opinion" (People v Stone, supra, at 75). Although in Stone the Court permitted the expert testimony, importantly "the court ha[d] reasonably assured itself of a legally competent basis for the psychiatrist's opinion" (id., at 75).
Thereafter, in People v Sugden (35 N.Y.2d 453), this Court confronted the issue of whether an expert opinion may be based on an out-of-court written statement of a witness who testified at trial (id., at 456). The Court stated that Stone "reflect[s] to some degree a policy which would allow an expert to base his *117 opinion on material not in evidence, provided the data relied upon is of the kind ordinarily accepted by experts in the field" (id., at 459 [emphasis added]). The Court concluded that a psychiatrist may refer to out-of-court evidence under two circumstances: when the evidence "is of a kind accepted in the profession as reliable in forming a professional opinion," and when it "comes from a witness subject to full cross-examination on the trial" (id., at 460-461). A per se admissibility authorization would eliminate these important threshold safeguards built into the rule by our precedents.
Recently, in People v Angelo (89 N.Y.2d 217), this Court considered whether a psychiatric expert may testify to reliance on a polygraph examination of the defendant. While CPL 60.55 was inapplicable because the defendant had not asserted an insanity defense, we observed that the exceptions to the common-law rule discussed in People v Sugden permitting an expert to base an opinion on out-of-court evidence under certain conditions, "specifically incorporate the customary admissibility test for expert scientific evidence  which looks to general acceptance of the procedures and methodology as reliable within the scientific community" (People v Angelo, supra, at 222-223 [emphasis added] [citations omitted]). That is the apt reliance which we give to our recent unanimous utterance.
Our principal controlling precedents regarding the application of CPL 60.55 (1) highlight this Court's consistent policy that evidence offered by a psychiatric expert be of a kind established as generally accepted in the profession as reliable (People v Sugden, 35 N.Y.2d 453, supra; People v Stone, 35 N.Y.2d 69, supra). CPL 60.55 (1) does not overrule the reliability need for a Frye or Frye-like hearing in all instances when a party seeks to present novel scientific or psychiatric or medical evidence. The Legislature neither expressly nor impliedly enacted such a comprehensive change. Its intent to retain some reliability requirement in CPL 60.55 (1) is reflected in our controlling precedents and is further evidenced by the statute's reasonableness component  requiring that a psychiatric expert "be permitted to make any explanation reasonably serving to clarify his [or her] diagnosis and opinion" (emphasis added).
In sum, the trial court did not err in narrowly precluding only the ultimate, bottom-line expert testimony of neonaticide syndrome  even if the precise words were going to be deftly and strategically avoided. The experts should not have been allowed to parade before the jury nontestifying experts' publications about a theoretically profile, without a reliability foundation *118 being satisfied at the threshold. We are satisfied that trial courts under a proper application of CPL 60.55 (1) should retain some measure of authority to examine such potentially unreliable and prejudicial evidence before automatically allowing its admission before the jury for its weight assessment.
Finally, based on our precedents, we agree with the Appellate Division that the trial court did not deprive defendant of a fair trial by admitting the photograph of the deceased infant into evidence; moreover, the argument as to the sentence is beyond our review.
Accordingly, the order of the Appellate Division should be affirmed.
SIMONS, J. (dissenting).
CPL 60.55 provides a narrow exception for the introduction of hearsay evidence when the defendant asserts an affirmative defense based upon mental disease or defect. In such cases any psychiatrist or psychologist who has examined the defendant and offers an opinion on defendant's mental capacity at the time of the crime "must be permitted to make any explanation reasonably serving to clarify his diagnosis and opinion" (CPL 60.55 [1] [emphasis added]). The exception applies whether the expert testifies for the People or the defendant. The statute was enacted to provide a broad rule of admissibility for expert testimony in the narrow circumstances it addresses (see, Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 60.55, at 147), one that is far less stringent than the common-law reliability test.
The majority would undermine the legislative purpose by holding that before an expert can refer to various psychiatric conditions discussed in the scientific literature used to inform his or her opinion, those conditions must be generally accepted by the scientific community to a degree satisfying the test for admissibility set forth in Frye v United States (293 F 1013). However, admissibility must be determined by the context and purpose of the expert testimony, not the substance of the evidence. If the evidence is offered by an expert testifying in support of the affirmative defense, and if it reasonably serves to clarify the expert's opinion or diagnosis, it should be admitted even if the substance of it has not attained general acceptance in the relevant scientific community. It is then for the jury to determine the weight to be accorded the expert's opinion after hearing the basis for it. Because I believe the neonaticide evidence reasonably served to clarify the experts' opinions in this case, I dissent.
*119 I agree with the majority that our law generally requires application of the Frye standard to determine the admissibility of an expert's testimony regarding a novel scientific principle or procedure (see, majority opn, at 115). The Frye test, however, is a test of admissibility. It ensures that the evidence presented to the jury to establish relevant scientific facts is reliable. For example, in People v Wesley (83 N.Y.2d 417) the People used a novel scientific test  DNA profiling  to identify the DNA in bodily fluids obtained from various items of evidence and those facts were used to establish defendant's identity as the perpetrator. The Frye test was applied to ensure that the DNA tests were reliable means of identifying characteristics of bodily fluids. Similarly, in People v Taylor (75 N.Y.2d 277) an expert, who had not examined the witness and was not testifying about her behavior as such, testified that there exists a rape trauma syndrome and described what it is. Those facts were then used by the People as affirmative evidence to establish the reasonableness of the rape victim's conduct which, to the lay jury, might seem inconsistent with the behavior one might expect of a rape victim. The evidence in Taylor was offered to negate the inference that the victim had consented, and the Frye test was applied to determine whether the rape trauma syndrome evidence was reliable.
As these decisions demonstrate, the Frye test is generally applied to determine the admissibility of a novel scientific principle or procedure when the scientific evidence derived from the novel procedure or principle is itself offered as proof (see, People v Middleton, 54 N.Y.2d 42, 49-50 [scientific evidence from bite marks on victim's body]; People v Allweiss, 48 N.Y.2d 40, 50 [hair found at crime scene]; People v Henson, 33 N.Y.2d 63, 73-74 [battered child syndrome; used to establish that injuries were not accidental and were sustained at the hands of parents]; cf., People v Angelo, 89 N.Y.2d 217 [polygraph evidence not admissible to negate the necessary mens rea element of offenses charged]; People v Leone, 25 N.Y.2d 511 [polygraph]; People v Williams, 6 N.Y.2d 18, cert denied 361 US 920 [theory that heroin addicts were generally not credible could not be used to challenge witness's credibility]).
The evidence authorized by CPL 60.55 (1) is offered for a very different reason: to explain the basis for the expert's diagnosis and opinion. The section was enacted to relax the common-law rules of admissibility when: (1) an expert who has examined the defendant; (2) offers an opinion of the defendant's mental condition at the time of the crime; (3) in support of the *120 affirmative defense of mental disease or defect. This narrow statutory exception was thought necessary to permit the psychiatric expert to refer to and explain sources of relevant background information commonly used and necessary in forming a medical judgment. The statute was designed to permit a psychiatrist to give the basis for his or her opinion because preventing the expert from doing so vastly limits the value of psychiatric evidence (see, Matter of Lee v County Ct., 27 N.Y.2d 432, 441; see also, Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 60.55, at 147; Comment to Model Penal Code § 4.07 [4]). It was enacted to overcome the constricting common-law rule set forth in People v Keough (276 N.Y. 141) and to permit experts to tell the jury that the opinion it is asked to evaluate is based on matters that experts in the field usually rely upon, even though some of the items considered are not in evidence. The statute accommodates two potentially conflicting concerns  the medical soundness of the expert's testimony and legal admissibility of expert opinion  and strikes a balance between them (People v Stone, 35 N.Y.2d 69, 75). It permits otherwise inadmissible evidence to be received but explicitly provides that the expert may be cross-examined as to "any matter bearing on his competency or credibility or the validity of his diagnosis or opinion" (CPL 60.55 [1]).
The purpose of expert opinion evidence is to inform the jury on scientific matters about which they have no knowledge. In the specific context of the affirmative defense, the experts are trying to explain to lay jurors how they could determine retrospectively what defendant's mental state or condition was at the time of the crime when they did not observe her condition then. Mental disease is a highly complex area in which diagnosis depends heavily on subjective judgments. The Legislature has recognized that when a defendant asserts an affirmative defense based on mental disease it is important for the jury to be fully informed about the basis for the psychiatrist's opinion so that it may evaluate it. If the expert's diagnosis and opinion are based on theories that are of questionable validity (and therefore inadmissible under the Frye standard), the opposing party may challenge the medical soundness of the theory informing the expert's opinion, and "[t]he jury may then take the opinion for what they think it is worth" (People v Stone, supra, 35 NY2d, at 76).
Thus, in People v Stone (supra) and People v Sugden (35 N.Y.2d 453)  our only controlling precedents in this context  *121 psychiatrists who had examined defendants were permitted to refer to extrajudicial hearsay statements that would ordinarily have been inadmissible because of their inherent unreliability. The evidence was admissible under the circumstances because it was information upon which the experts relied and was presented solely to explain the basis for their opinions that the defendants were legally sane when they committed their crimes.[*] Similarly, in this case defendant's experts were not trying to establish that the scientific community generally recognizes a neonaticide syndrome. They were attempting to testify that some women suffered from similar symptoms and that they had used that information when making a diagnosis, along with the patient's history, their examination findings and interviews with those who could shed light on defendant's condition. That this neonaticide information may have been unreliable or the doctors foolish to rely upon it was a matter of weight not admissibility.
To be sure, the court may, in its discretion, foreclose the use of such testimony because the witness' reliance is unreasonable under the circumstances. It cannot, however, bar the testimony as a matter of law because it does not meet the reliability standard of Frye. The statutory provision speaks of "reasonableness", nothing more, and manifestly, it is reasonable for a psychiatrist to consider scientific theories which have yet to attain general acceptance.
After examining defendant, the experts diagnosed her as having suffered a reactive psychosis at the time of the homicide, and they offered their opinions that at that time she was unable to appreciate the consequences and wrongful nature of her actions. The experts established the necessary foundation for their opinions by detailing their personal examinations of defendant and their investigation of her conduct and emotionality over a period of time (see, People v Stone, supra, 35 NY2d, at 73, 76). They should also have been permitted to explain how that evidence assisted them in concluding that defendant suffered a psychotic break at the time of the homicide by reference to articles they had studied in the medical literature which discussed other psychiatrists' experience with women whose circumstances and conduct were similar. The experts testified that it is common in their field to draw on colleagues' *122 experiences, and the materials on which they relied were facially reasonable because they were written by legitimate practitioners and published in recognized medical journals. The evidence was thus "data * * * of the kind ordinarily accepted by experts in the field" (People v Sugden, supra, 35 NY2d, at 459) and under provisions of the statute the psychiatrists "must be permitted" to present it in reasonable explanation of their opinion. The Court's failure to allow them to do so here violated CPL 60.55 (1). Defendant's experts were precluded from fully explaining the basis for their opinions and the jury was precluded from fully evaluating the opinions. Accordingly, defendant's presentation of her affirmative defense was compromised and reversal is required.
Order affirmed.
NOTES
[*] The majority's reliance on People v Angelo (88 N.Y.2d 217, supra) is not in point. Defendant in that case did not assert an affirmative defense of insanity and therefore was not entitled to the liberal rule of admissibility CPL 60.55 (1) permits.